MULTIUT CORPORATION, Plaintiff-Appellee, v. YEHUDA DRAIMAN *et al.*,
Defendants-Appellants.

First District (5th Division)   Nos. 1—03—0857, 1—03—2855, 1—04—1192,
1—04—2377 cons.

Opinion filed July 22, 2005.

Yehuda Draiman, of Chicago, appellant *pro se.*

Greenberg Traurig, L.L.P. (Paul T. Fox and Edward M. Shin, of counsel), and Novoselsky Law Offices (David A. Novoselsky, of counsel), both of Chicago, and Alan J. Mandel, Ltd., of Skokie (Alan J. Mandel, of counsel), for appellee.

JUSTICE GALLAGHER delivered the opinion of the court:

This opinion encompasses three related appeals involving defendants Yehuda and Miriam Draiman and plaintiff Multiut Corporation (Multiut), an energy consulting and energy management services company based in Skokie. Central to defendants' appeals are case Nos. 1—03—0857 and 1—03—2855, in which defendants challenge the trial court's rulings in favor of Multiut and its award of more than $1 million in attorney fees. Defendants have separately appealed the trial court's order of indirect civil contempt and sanctions against Yehuda and an injunction prohibiting Yehuda from competing

against Multiut. We have consolidated these appeals *sua sponte*. For the reasons set forth in this opinion, we affirm the judgments of the trial court in case Nos. 1—03—0857, 1—03—2855 and 1—04—1192. Defendants' appeal in case No. 1—04—2377 is dismissed.

## BACKGROUND

The voluminous record on appeal can be distilled to these relevant facts. Yehuda and Miriam Draiman are husband and wife, and Nachshon Draiman, Yehuda's brother, is the president of Multiut. Multiut was founded in the mid-1980s after the deregulation of the energy industry and negotiates contracts with natural gas and electricity suppliers to provide those utilities to businesses. Multiut employs independent Multiut associates (IMAs) on commission who offer gas and electrical auditing services and advise its customers about possible energy savings.

The following testimony was offered at a hearing on Multiut's motion for a preliminary injunction against defendants and at a trial on the merits.[1] Nachshon testified that he hired Yehuda in 1989 at the behest of their father. Miriam had already executed an IMA agreement and was receiving commissions, which were being paid to M. Draiman Corporation. Nachshon testified that Yehuda asked to be placed in a salaried position with Multiut and that Yehuda did not want to receive wages that could be garnished because he was being pursued by creditors.

In February 1991, Yehuda and Nachshon executed a written IMA agreement, which included a covenant not to compete and a confidentiality provision as to Multiut's methods of operation. Several handwritten lines above Yehuda's signature indicated that in addition to being an IMA, Yehuda also would be the sales and marketing manager of Multiut.

Nachshon testified that in 1998 or 1999, he and Yehuda discussed the continuing deregulation of the electricity business and Multiut's potential growth in the electrical auditing market. Yehuda expressed an interest in exploring those opportunities and Nachshon encouraged him to do so. In December 2000, Nachshon learned that Yehuda had represented to Multiut's customers that Multiut was affiliated with various companies that Yehuda and Miriam had formed. Nachshon also learned that Yehuda had opened a bank account in the name of Multiut Electric and had executed contracts to take customers away from Multiut. Nachshon testified that two Multiut employees told him

---

[1]Additional testimony will be discussed later in this order as it pertains to a particular issue.

they had worked on Multiut Electric's accounts with the belief that Multiut Electric was affiliated with Multiut.

Nachshon said he was aware that Yehuda had marketed his own telecommunications business via the Multiut website; however, he denied allowing Yehuda to use the Multiut name. Nachshon testified that he was concerned that Yehuda would take business away from Multiut. He stated that access to the company's customer list was limited to himself and two computer programmers. Nachshon testified that Yehuda removed a computer from his (Yehuda's) Multiut office; the computer was returned a few months later, after the beginning of litigation between the parties, with the hard drive erased.

On December 5, 2000, Nachshon wrote a letter to Yehuda and Miriam recounting a litany of family issues and concluding as follows:

"[I]n lieu of any other alternative, I am going to ask you to resign from your employment at Multiut [C]orp. Absent the resignation, consider this a notice of termination. You may continue as an independent contractor subject to following all the rules set forth by the company and the same privileges as any other IMA. This will give you the ability to do other business as you wish.

I want to remind you and reiterate that involvement in any gas, electric or other related ventures of Multiut [C]orp. are direct violation of the agreements [sic]."

An April 2001 letter from Nachshon, addressed to Yehuda, Miriam and the various defendant companies, further stated, in relevant part:

"I will continue to regard your involvement with the company as a regular [IMA], and any funds, commissions or advances that you have received and will receive will be adjusted accordingly. I ask that any accounts that you are going to contact be first submitted in writing to me and approved by me before contact is made. You may not contact company customers, either yours and certainly other salesman's and or company accounts without the explicit written authorization of the company."

On June 28, 2001, the trial court entered an agreed order prohibiting Yehuda, Miriam and the defendant companies from using Multiut's "business plans, pricing methods, customer lists, marketing materials and customer specifications" for 14 days. The temporary restraining order permitted defendants to contact customers during the two-week period after providing written notice to Multiut's counsel. The order barred defendants from spending or transferring funds derived from Multiut clients and also prohibited them from entering Multiut's offices or contacting Multiut employees. That order was extended through May 2002 via Multiut's additional requests for injunctive relief.

Loyd Bostic testified that he started his own utility auditing

company, LBE Limited, in 1991. He met Yehuda in 1992 and signed an IMA agreement with Multiut that year. Bostic testified that in 1998, Yehuda asked Bostic if he would sell his accounts to Yehuda at a deep discount. When Bostic asked Yehuda why he would sell his accounts at a low price, Yehuda replied that Bostic was going to be fired. Bostic disregarded Yehuda's remark and did not mention it to Nachshon. Bostic stated that he perceived himself to be in partnership with Multiut and that he dealt mostly with Yehuda.

Bostic testified that in April 2001, he met with Yehuda and Gershon Draiman, who is Yehuda and Nachshon's nephew.[2] Yehuda sought Bostic's involvement in establishing an independent auditing company named U.S. Utilities under Gershon's direction because Yehuda was concerned about his noncompetition agreement with Multiut. Bostic informed Nachshon of Yehuda's plan. At the time of his testimony, Bostic continued to work with Nachshon and Multiut.

Testifying as an adverse witness, Yehuda stated that he and Miriam formed various companies, including M. Draiman Corporation (formed in 1991), U.S. Gas, Electric & Telecommunications Corporation (formed in 1999 from a company named D&D Medical Supply), Multiut Electric (formed in 1999 from SGG Diamond, Inc.), and U.S. Gas & Energy Corporation (formed in 2000). Yehuda testified that he opened an account for Multiut Electric at Success National Bank, where Multiut had several accounts. Yehuda stated that Nachshon agreed to his use of the Multiut name.

In its second amended complaint, Multiut alleged that Yehuda, Miriam, Gershon and David (one of Yehuda and Miriam's two sons) formed the defendant companies to divert business and revenue away from Multiut. Multiut alleged that the defendant companies were "alter egos" or fictional fronts for Yehuda and Miriam's actions and that Yehuda interfered with Multiut's business relationship with Bostic's company, LBE, and further interfered with Multiut business by using the name Multiut Electric. The complaint included counts of replevin, breach of fiduciary duty, breach of contract, tortious interference with contract, civil conspiracy, common law trademark infringement and violations of the Illinois Trade Secrets Act (765 ILCS 1065/1 *et seq.* (West 2000)), the Trademark Registration and Protection Act (765 ILCS 1036/1 *et seq.* (West 2000)), the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2000)), and the Uniform Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.* (West 2000)).

---

[2]Although Gershon was named as a defendant at one time, he was dismissed prior to trial on Multiut's motion.

Defendants raised several affirmative defenses, including unclean hands, waiver, estoppel and *laches*. Defendants asserted, *inter alia*, that Nachshon unilaterally altered portions of the February 1991 IMA agreement. In addition, defendants filed a counterclaim against Multiut, contending that Multiut breached its contract with Yehuda, that Yehuda was owed damages for commissions he earned and that Multiut was unjustly enriched by retaining the benefits of Yehuda's labor.

On January 17, 2003, in a 15-page written opinion, the trial court found that the various corporate defendants were alter egos of Yehuda and held in Multiut's favor on its claims of breach of fiduciary duty, breach of contract and violations of the Trade Secrets Act and the Uniform Deceptive Trade Practices Act. In addition, the court held that Yehuda and Miriam engaged in a civil conspiracy to breach Yehuda's relationship with Multiut. Although the court found for Multiut on its claim that Yehuda tortiously interfered in its business relationships, it noted that count mirrored the facts underlying Multiut's successful claim for a violation of the Trade Secrets Act. The court held that Multiut had not presented sufficient evidence to support its claim under the Trademark Registration and Protection Act. The court held that a bank account in Multiut Electric's name was the property of Multiut. The court also awarded Multiut $250,000 in compensatory damages and assessed $250,000 in punitive damages against Yehuda.

On August 26, 2003, in a separate order, the court awarded Multiut $1,002,046 in attorney fees. On October 14, 2003, the trial court found Yehuda in indirect civil contempt for violating various court orders and imposed $45,000 in fines against him for three separate acts. Upon Yehuda's motion to reconsider, the trial court vacated $25,000 of that amount.

## ANALYSIS

As an introductory matter, we observe that case Nos. 1—03—0857 and 1—03—2855 have been consolidated on Multiut's motion. Since that appeal was placed on our docket, defendants have brought two additional appeals (No. 1—04—1192 and No. 1—04—2377) that arise from the complaint in case No. 1—03—0857. We have consolidated all three of these appeals *sua sponte* to allow us to consider the entirety of defendants' contentions in this opinion.

Multiut asserts that this court has received briefs only from Yehuda and Miriam Draiman and that the defendant companies have failed to submit arguments in support of their appeal. The evidence presented at trial established that the aforementioned companies were alter egos of Yehuda and Miriam. Therefore, this appeal considers only the points raised in the briefs filed by Yehuda and Miriam.

■ We next note that although defendants were represented by counsel in the trial court, Yehuda and Miriam have chosen to represent themselves in each case at bar and have filed separate *pro se* briefs in each of these appeals. Yehuda repeatedly laments his *pro se* status and depleted financial resources while complaining of his unfamiliarity with the legal process. Although Yehuda and Miriam have the right to appear as *pro se* appellants, they are held to the same rules as any other litigant represented by counsel (see *Athens v. Prousis*, 190 Ill. App. 3d 349, 356, 546 N.E.2d 695, 700 (1989)), and despite their recurrent pleas, their *pro se* standing does not compel this court to apply a more lenient standard.

■ Lastly, in each of the three appeals here, Multiut has brought a motion to strike the documents attached to defendants' briefs as exhibits, contending that those materials were not served on it or made part of the record on appeal. Multiut asks this court to impose sanctions against defendants pursuant to Supreme Court Rule 375(a) (155 Ill. 2d R. 375(a)). As to case Nos. 1—04—1192 and 1—04—2377, Multiut asserts that defendants should be sanctioned for filing appeals that are frivolous and in bad faith. We have ordered that Multiut's motions and the defendants' responses be taken with the case.

All matters reviewed on appeal must be made part of the official court record, and a copy of an item attached to a brief cannot be considered by this court. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 352 Ill. App. 3d 630, 639, 816 N.E.2d 379, 386 (2004); *In re Marriage of Chapman*, 285 Ill. App. 3d 377, 381, 674 N.E.2d 432, 434 (1996). Multiut's motions to strike are granted, and we do not consider any materials attached to defendants' briefs that have not been made part of the record. Multiut's requests for sanctions will be addressed at the conclusion of this opinion.

1. Case Nos. 1—03—0857 and 1—03—2855 (consolidated)

In challenging the trial court's ruling on Multiut's complaint, Yehuda has filed an appellate brief laden with *ad hominem* attacks. His initial brief fails to argue specific legal issues to this court on which he requests relief. Although Yehuda's reply brief also contains numerous asides, it is slightly more directed. As a general rule, points not argued in an appellant's brief are waived and may not be raised in the reply brief. 177 Ill. 2d R. 341(e)(7); see also *Gunn v. Sobucki*, 352 Ill. App. 3d 785, 788, 817 N.E.2d 588, 591 (2004). However, because some of the arguments in Yehuda and Miriam's reply briefs can be read largely as responses to contentions raised by Multiut, our discussion of the Draimans' arguments will include several points raised solely in their reply briefs.

■ The trial court's decision following a bench trial should be overturned only if it is against the manifest weight of the evidence, meaning that the opposite conclusion is apparent or the ruling is unreasonably arbitrary. *In re Marriage of Kendra*, 351 Ill. App. 3d 826, 829, 815 N.E.2d 22, 24 (2004). A judge's findings of fact do not violate this standard merely because the record might support a contrary decision; rather, if the record contains any evidence to support the trial court's judgment, the judgment should be affirmed. *Department of Transportation ex rel. People v. 151 Interstate Road Corp.*, 209 Ill. 2d 471, 488, 810 N.E.2d 1, 11 (2004); *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 373, 816 N.E.2d 754, 762 (2004).

### a. *Trade Secrets Act*

■ Yehuda asserts that although the court's basis for finding that he violated the Trade Secrets Act is unclear, his use of Multiut's customer lists did not breach the Act. To establish a violation of the Act, a plaintiff must prove that the information at issue was: (1) a trade secret (2) that was misappropriated and (3) used in the defendant's business. *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 790, 772 N.E.2d 768, 780 (2002). Multiut responds that the trial court correctly found violations of the Act based on evidence that Yehuda misappropriated two types of trade secrets: (1) customer lists and (2) pricing information and strategies. Yehuda replies that Multiut customer information was not a trade secret and that he did not compile the data by improper means because he serviced those accounts while working for the company. As to his use of the marketing and pricing information, Yehuda contends his general knowledge of the energy industry cannot constitute a trade secret, and he argues that he developed the Multiut marketing strategies himself from those used in his previous businesses.

■ To claim protection as a trade secret, a plaintiff must show that: (1) the information was sufficiently secret to give it a competitive advantage; and (2) affirmative measures were taken to prevent others from acquiring or using the information. 765 ILCS 1065/2(d)(1), (d)(2) (West 2000). As was noted in *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 791, 772 N.E.2d 768, 780 (2002):

> "The protection afforded trade secrets reflects a balancing of conflicting social and economic interests. Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means. [Citation.] Nevertheless, in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation."

Customer lists and pricing information have been recognized as trade secrets, although such determinations have hinged on the facts of a case. In *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265 (2005), the appellate court examined several decisions and concluded that the customer information met the first requirement, *i.e.*, it was sufficiently secret to provide the plaintiff businesses with a competitive advantage. *Liebert*, 357 Ill. App. 3d at 278-79. However, although the plaintiff corporations restricted computer access to the customer list and prevented workers from taking customer information when they left the company's employ, the court noted that the corporations did not require workers to sign confidentiality agreements, inform employees that records were confidential, or label the information as confidential. *Liebert*, 357 Ill. App. 3d at 279. The court therefore held that the trial court's finding that the plaintiffs' customer lists were not trade secrets was not against the manifest weight of the evidence based on the companies' "limited security measures." *Liebert*, 357 Ill. App. 3d at 279. In contrast, in *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1176-77 (2000), this court held that a software developer stated a cause of action against a former employee for violating the Act, noting that the employer alleged that the customer lists took considerable time, effort and expense to compile and that the employer attempted to protect the information by limiting computer access and using confidentiality agreements.

■ Here, Multiut presented testimony that it attempted to safeguard its customer data by limiting access to both printed and computer-stored copies of the information and by requiring employees to sign confidentiality agreements. Multiut therefore took steps to protect the customer information from competitors. The trial court's ruling that defendants violated the Trade Secrets Act was not against the manifest weight of the evidence.[3]

Yehuda argues that no evidence was presented that he "sold or otherwise disseminated" the Multiut customer or marketing information. However, the Act does not require proof of those activities; it only requires that the Multiut information be used in Yehuda's business. Yehuda does not contest that point. Because we have concluded that Multiut's customer lists were trade secrets and that Yehuda

---

[3]Multiut further contends that circumstantial evidence, such as spoliation of evidence by a defendant, can support a finding of misappropriation. See *Liebert*, 357 Ill. App. 3d at 283. Indeed, as the trial court noted in its opinion, a court-appointed computer expert testified that Yehuda's computer contained evidence of erasure and over-recording of data in violation of the court's order enjoining alteration of the computer.

misappropriated and used the information in his own businesses, thus violating the Trade Secrets Act, we need not address whether Multiut's marketing and pricing plans meet the definition of a trade secret.

### b. *Uniform Deceptive Trade Practices Act*

■ Yehuda also challenges the trial court's finding that he engaged in deceptive trade practices. As with many of his *pro se* contentions, the legal basis of his argument is difficult to ascertain. The Uniform Deceptive Trade Practices Act (815 ILCS 510/2(2), (3) (West 2000)) provides that when a party, in the course of his or her business or occupation, engages in any conduct that creates a likelihood of confusion or misunderstanding, a deceptive trade practice occurs. *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill. App. 3d 995, 1002, 574 N.E.2d 760, 764 (1991). Here, the trial court found that defendants violated two different provisions of the Act by creating the likelihood of confusion or misunderstanding as to the source of the goods and services that Yehuda offered and also by creating a likelihood of confusion as to Yehuda's affiliation or association with Multiut. The trial court heard testimony that Yehuda represented to Multiut's customers that Multiut was affiliated with various companies that he and Miriam had formed and that he opened a bank account in the name of Multiut Electric at the same establishment that handled Multiut's accounts. We conclude that the trial court's ruling was not contrary to the manifest weight of the evidence.

In his reply brief, Yehuda directs this court's attention to documents that he attached to that brief as exhibits. As we have noted previously, all matters reviewed on appeal must be made part of the official court record, and a copy of an item attached to a brief cannot be considered by this court. *Illinois Bell Telephone Co.*, 352 Ill. App. 3d at 639, 816 N.E.2d at 386. We have granted Multiut's motion to strike those materials.

### c. *Conspiracy*

Yehuda next contends that the conspiracy in this case took place not between himself and his wife, but rather when he and Nachshon agreed to Yehuda's role as an independent contractor. In a separate brief, Miriam more comprehensively addresses the conspiracy count, describing herself as a "compliant spouse" and arguing that she is not a proper party to this litigation. Essentially pleading ignorance, Miriam asserts that the actions of her husband and Nachshon involved her in the defendant companies in name only.

■ A civil conspiracy occurs when two or more people combine to accomplish, through concerted action, either an unlawful act or a lawful act in an unlawful manner. *Rodgers v. Peoples Gas, Light & Coke*

*Co.*, 315 Ill. App. 3d 340, 350, 733 N.E.2d 835, 843 (2000). The basis of the conspiracy does not rely on the particular combination of roles performed by the conspirators; rather, "[t]he conspiracy may be inferred if parties pursue the same object by common means, one performing one part and another performing another part." *Rodgers*, 315 Ill. App. 3d at 350, 733 N.E.2d at 843, citing *Forkin v. Cole*, 192 Ill. App. 3d 409, 427, 548 N.E.2d 795 (1989).

■ The evidence presented at trial established that the defendant companies, including Multiut Electric and M. Draiman Corporation, were alter egos of Yehuda and Miriam, who both acknowledged forming the entities. Miriam testified that although she was the nominal president, secretary and sole shareholder of the four defendant companies, she performed no duties and Yehuda, in her words, "took care of all the day-to-day things." She stated that her husband proposed the companies' formation, and she professed ignorance of the companies' customers and operations, although she said they discussed changing the name of SGG Diamond to Multiut Electric and also discussed affairs of the other defendant companies.

Miriam contends that her passive actions do not constitute proof that she knowingly agreed to conspire with her husband. Noting Multiut's citation of the Illinois Supreme Court's opinion in *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 720 N.E.2d 242 (1999), Miriam argues that under *McClure*, civil conspiracy is an intentional tort that requires proof that she knowingly and voluntarily participated in a scheme against Multiut.

However, Miriam neglects to acknowledge the supreme court's further statements in *McClure* that although accidental or inadvertent participation does not amount to conspiracy, a defendant " 'who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives *** is liable as a conspirator.' " *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258, quoting *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 64, 645 N.E.2d 888 (1994). The *McClure* court goes on to note:

> "A conspiracy is almost never susceptible to direct proof. [Citation.] Usually, it must be established 'from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.' [Citation.]" *McClure*, 188 Ill. 2d at 134, 720 N.E.2d at 258.

If a civil conspiracy is shown by circumstantial evidence, that evidence must be clear and convincing, which is the level of proof that lies between a "preponderance of the evidence" standard and the "reasonable doubt" criterion required for a criminal conviction. *Mc-*

*Clure*, 188 Ill. 2d at 134, 720 N.E.2d at 258; *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 69-70, 823 N.E.2d 93, 102 (2005). Under the "clear and convincing" standard, " 'if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved.' " *McClure*, 188 Ill. 2d at 140-41, 720 N.E.2d at 261, quoting *Tribune Co. v. Thompson*, 342 Ill. 503, 529, 174 N.E. 561 (1930).

Although the evidence presented as to a conspiracy between Yehuda and Miriam was partially circumstantial (since, as noted in *McClure*, it is difficult to obtain explicit testimony to that effect), Multiut also presented direct evidence that the couple acted together to form companies, including one company with "Multiut" in its name. Miriam's "innocent spouse" defense is belied by her prior affiliation with Multiut, which began in 1989 when she was an IMA and continued when she assisted Yehuda in his work for Multiut. The evidence established that Miriam understood and accepted the general objectives of the conspiratorial scheme. We conclude that Multiut demonstrated by clear and convincing evidence that Yehuda and Miriam engaged in a civil conspiracy that enabled Yehuda to breach his contract with and his fiduciary duty to Multiut.

### d. *Award of Attorney Fees in Case No. 1—03—2855*

Following the trial court's January 2003 order granting judgment for Multiut on the complaint, Multiut sought more than $1 million in attorney fees. On August 26, 2003, the trial court entered a judgment of $1,002,046 for Multiut and against defendants. Defendants filed a timely notice of appeal of that order to this court.

Yehuda now contends that amount is unreasonable, arguing that three law firms are listed on Multiut's brief and that the fee award equals a legal expense of about $30,000 per trial day for the approximately 35-day bench trial. Multiut responds that Yehuda did not challenge the fee award in his initial brief to this court (the above assertions were made in Yehuda's reply brief) and that he has thereby waived his opposition to the judgment. Issues raised in the notice of appeal but not raised or argued to this court are generally deemed waived. *In re Marriage of King*, 336 Ill. App. 3d 83, 91, 783 N.E.2d 115, 122 (2002). Yehuda has waived his contentions as to the propriety of the award of attorney fees to Multiut.

As to Miriam's liability for the fee award, she makes no argument other than remarking in the conclusion of her appellate brief that this court "reversed the assessment of *** attorney fees." Miriam presumably refers to the *sua sponte* order entered on January 30, 2004, and signed by one justice of this court that stated, *inter alia*, that Miriam

was not named as a defendant in the count that resulted in the judgment of $1,002,046 and is not liable for that portion of the judgment.

Multiut argues that although Miriam apparently refers to the January 2004 order in contending that this court has reversed the fee award, that order has no effect on this appeal. Multiut asserts that an order signed by one appellate court justice has no operative effect, and it has appealed that issue to the Illinois Supreme Court (petition for leave to appeal No. 98015, filed March 5, 2004).[4]

Multiut contends that Yehuda and Miriam, in their joint answer to Multiut's petition in support of the fee award, did not argue that Miriam was not liable for the fees. Multiut points out that Miriam was represented by counsel at the hearing on the fee petition who did not contest her liability, and that although Miriam later argued in a motion to clarify the fee award that her liability should be reduced because of her lower degree of culpability, she did not assert that she bore no liability for the fee award.

Miriam does not respond to those contentions and offers no legal argument that would free her from the judgment against her and the other defendants. We therefore conclude that Miriam has waived any contention before this court that she is not liable for a portion of the fee award, though we note the supreme court has yet to rule on Multiut's appeal of the January 2004 order. Because both Yehuda and Miriam have waived their arguments regarding the award of attorney fees in case No. 1—03—2855, the trial court's judgment on that point is affirmed.

### 2. Case No. 1—04—1192

■ In a separate appeal, Yehuda raises two contentions as to the June 28, 2001, temporary restraining order. Yehuda first argues that the purpose of such an order is to preserve the status quo until a hearing can be held, and he asserts that after the expiration of the 14-day period in the order, the trial court failed to hold a hearing on its merits despite his constant demands for such a proceeding.

Multiut responds that the trial court began to hear testimony on Multiut's motion for a preliminary injunction in March 2002 and that upon agreement of the parties, the court converted the matter to a trial on the merits of Multiut's complaint (case No. 1—03—0857).

---

[4]That petition for leave to appeal remains pending before the supreme court; however, this court is not stripped of the ability to address the issue. See *Whitcanock v. Nelson*, 81 Ill. App. 3d 186, 189, 400 N.E.2d 998, 1000 (1980) ("[a] reviewing court is divested of its jurisdiction over an appeal before it when its mandate issues to the lower court, or when petition for leave to appeal to a higher court is *granted*" (emphasis added)).

Multiut further contends that Yehuda never appealed the temporary restraining order and that he therefore has waived his right to challenge that injunctive relief. Multiut cites Supreme Court Rule 307(d) (188 Ill. 2d R. 307(d)), which requires appeals from the granting or denial of a temporary restraining order to be filed within two days of the entry or denial of the order. See *Goodwin v. Puccini*, 319 Ill. App. 3d 485, 488, 745 N.E.2d 163, 166 (2001). We agree that this provision is dispositive of Yehuda's contentions on this point.

Yehuda's second assertion is that the trial court judgments reflect a finding of direct criminal contempt, as opposed to indirect civil contempt, because the court ordered monetary fines for his past conduct. Yehuda argues that he was denied the constitutional protections that are required in a criminal contempt proceeding.[5] Multiut responds that Yehuda's counsel raised this issue in the trial court, at which time the court clarified that the contempt proceedings against Yehuda were civil.

▄ Contempt can be either criminal or civil and either direct or indirect; indirect contempt arises from conduct that occurred outside of the judge's presence. *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 243, 813 N.E.2d 313, 319 (2004). "A civil contempt sanction is coercive and seeks to compel future compliance with a court order, whereas a criminal contempt sanction punishes a party for past conduct." *In re Marriage of Slingerland*, 347 Ill. App. 3d 707, 710, 807 N.E.2d 731, 734 (2004). The power to punish for contempt rests within the sound discretion of the trial court and its determination will not be disturbed on review absent an abuse of that discretion. *In re Estate of Maslowe*, 133 Ill. App. 3d 1043, 1046, 479 N.E.2d 1180, 1183 (1985).

▄ The record reveals that at the October 14, 2003, hearing on Multiut's motion for sanctions and the pending rules to show cause, the trial court noted at one point, "I don't think that there is any question that the petition before me is for indirect civil contempt." Later in the hearing, Multiut's attorney asked the court to consider a substantial monetary sanction against Yehuda for his continued failure to comply with the court's orders, stating that the court could "convert this to criminal contempt and impose some kind of a criminal sanction." Yehuda's attorney replied that his impression was that the court was considering indirect civil contempt and not a form of

---

[5]Yehuda again voices his frustration with the judicial system and argues that his *pro se* status places him at a disadvantage. We repeat our previous comment that Yehuda's decision to represent himself does not require this court to apply a more lenient standard when considering the substance of his contentions.

criminal contempt. The court responded to Yehuda's counsel that he was "correct" and that the proceeding was for indirect civil contempt. Multiut's attorney and the court had a similar exchange later, with the court stating, "In today's proceedings I indicated—I thought it was clear—that we are proceeding on indirect civil contempt."

As demonstrated from that record, the court announced several times that it was considering civil contempt, not criminal contempt, and Yehuda's counsel agreed. Moreover, Yehuda is incorrect in asserting that he was held in criminal contempt because the court ordered him to pay a monetary fine. While compensatory damages may not be awarded via a civil contempt proceeding (*Keuper v. Beechen, Dill & Sperling Builders, Inc.*, 301 Ill. App. 3d 667, 669-70, 704 N.E.2d 915, 917 (1998)), monetary fines can be assessed. See, *e.g.*, *Harper v. Missouri Pacific R.R. Co.*, 282 Ill. App. 3d 19, 30, 667 N.E.2d 1382, 1389 (1996) (noting that "civil contempt is not a private remedy but is punishment for an affront to the authority of the court, and hence, any fine imposed is payable to the public treasury and not to the plaintiff"). Here, the court ordered that Yehuda pay $45,000 in sanctions (later reduced to $20,000 on Yehuda's motion to reconsider) to the clerk of the circuit court of Cook County. Because the court found Yehuda in indirect civil contempt, Yehuda's assertions that he was entitled to the protections available in criminal contempt proceedings are unavailing. Accordingly, we affirm the trial court's rulings in case No. 1—04—1192.

### 3. Case No. 1—04—2377

Beginning in June 2001, the trial court entered a number of temporary restraining orders prohibiting defendants from, *inter alia*, using Multiut's business plans and other materials or entering Multiut's offices. Those orders extended through May 2002 via Multiut's additional requests for injunctive relief.

In the trial court's January 17, 2003, ruling on Multiut's complaint, the court granted Multiut permanent injunctive relief, preventing Yehuda from engaging in the electronic auditing and/or alternative sourcing business for electricity or gas for a period of 16 months. In January 2004, Multiut filed a petition for rule to show cause regarding Yehuda's alleged violation of the order. After various hearings, the court extended the injunction to June 30, 2004. On that date, the trial court heard evidence on Multiut's petition for rule to show cause and held that Yehuda had violated the January 2003 ruling and extended the injunction to October 17, 2004.

Yehuda now challenges the January 2003 ruling and the court's June 30, 2004, order. Although the legal bases of his arguments are

again difficult to decipher, Yehuda appears to argue that the court's extensions of the original injunction were improper and that the injunction constituted a restraint on his speech and his ability to do business.

Multiut responds that Yehuda's notice of appeal was filed on August 18, 2004, which was more than 30 days beyond the entry of the June 30, 2004, order, and that this court therefore lacks jurisdiction. As a further ground for dismissal, Multiut contends that the appeal is moot because the injunction that originated in the January 2003 order (and was extended via the June 2004 order) expired on October 17, 2004. Multiut further asserts that even if Yehuda's appeal was not mooted by the expiration of the injunctive relief, the trial court correctly found that Yehuda violated the injunction.

"It is a well-established proposition that jurisdiction only arises in the appellate court when a party timely files a notice of appeal." *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 521, 759 N.E.2d 509, 514 (2001). Moreover, "[a]n appeal is moot when it involves no actual controversy or the reviewing court cannot grant the complaining party effectual relief." *Steinbrecher*, 197 Ill. 2d at 522-23, 759 N.E.2d at 514. As Multiut contends, the court cannot dissolve an injunction that has expired. Accordingly, the appeal in case No. 1—04—2377 is dismissed.

## CONCLUSION

As to Multiut's motion for sanctions against defendants for the filing of frivolous appeals, we note the continuous appeals that have been brought before this court, and we see little utility in ordering monetary sanctions against Yehuda and Miriam at this stage given the multitude and amount of money judgments that they already face. Multiut's request for sanctions is therefore denied without prejudice.

For all of the aforementioned reasons, the judgments in case Nos. 1—03—0857, 1—03—2855 and 1—04—1192 are affirmed. Defendants' appeal in case No. 1—04—2377 is dismissed.

Nos. 1—03—0857, 1—03—2855, 1—04—1192, Affirmed.

No. 1—04—2377, Dismissed.

CAMPBELL, P.J., and NEVILLE, J., concur.