THIRD DIVISION
February 24, 2010

No. 1-09-2828

| | | |
|---|---|---|
| CITADEL INVESTMENT GROUP, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff - Appellant and Cross-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 09 CH 22478 |
| | ) | |
| TEZA TECHNOLOGIES LLC, a Delaware | ) | |
| Corporation, MIKHAIL MALYSHEV, and | ) | |
| JACE KOHLMEIER, | ) | Honorable |
| | ) | Mary K. Rochford, |
| Defendants - Appellees and | ) | Judge Presiding. |
| Cross-Appellants. | ) | |

JUSTICE STEELE delivered the opinion of the court:

Following an evidentiary hearing, plaintiff Citadel Investment Group, LLC (Citadel), filed this interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)), seeking reversal of the portion of the circuit court's order which granted preliminary injunctive relief lasting only through November 16, 2009, against defendant Mikhail Malyshev and through November 17, 2009, against defendants Jace Kohlmeier and Teza Technologies, LLC (Teza), and requesting a remand for the entry of an injunction of appropriate length. Defendants cross-appealed, contending that the circuit court erred in failing to dismiss the case and in entering a preliminary injunction because its ruling prevents the defendants from competing, and adopts an interpretation of the noncompetition agreements that violates public policy. For the following reasons, we affirm.

## BACKGROUND

### *Citadel*

Citadel is a Chicago-based financial services firm founded in 1990 by Ken Griffin. Citadel has approximately 1,300 employees across the world, with 1,000 in Chicago. Citadel is best known for its alternative investment management products and manages approximately $14 billion of aggregate capital on behalf of pensions, retirement funds, foundations, endowments, and employees of Citadel. Citadel provides some traditional, fundamental investments through its global equities strategies. Citadel is also involved in quantitative investment, including: options market making, volatility arbitrage, statistical arbitrage and high frequency trading. Citadel was one of the first investment firms to engage in high frequency trading, which grew out of Citadel's work in statistical arbitrage. Citadel had been working on statistical arbitrage strategies for seven years at the time it started working on high frequency trading.

A high frequency business consists of several interrelated parts, each of which is important: (a) recruiting and hiring high frequency talent; (2) building historical market data systems and parsers; (c) developing trading signals; (d) testing those signals against the collected historical market data; (e) creating realtime market data interfaces that permit the collection of data and the operation of trading strategies; (f) locating servers in strategic "co-location" exchanges; and (g) developing order entry and trading "engines." Combined, these activities include both developing the tools to trade and building the tools to identify appropriate trades.

Building a high frequency trading business requires finding the best personnel possible to perform overlapping work in information technology and quantitative research (QR)

1-09-2828

infrastructure. Recruiting and retaining employees is a critical and competitive portion of Citadel's high frequency business.

High frequency trading also requires the development of a vast collection of historical market data. Citadel has been gathering market data since it began the high frequency business, which was built on the foundation of Citadel's prior quantitative investment work. The data system contains the rough equivalent of approximately 100 times the amount of data included in the Library of Congress. In order to use the historical market data, codes and programs must be written to translate, organize and replay it. This process involves writing code to review and organize the data into a coherent and usable format. Market data replayers allow a particular signal or "alpha"[1] to be tested over historical market data. Citadel developed these tools in building its high frequency business. A combination of signals or "alphas" may be used in a trading strategy.

Moreover, Citadel built trading engines that read incoming real-time market data and, when the opportunity arises, execute its trading strategies and alphas to buy and sell securities. This is a critical piece of the infrastructure and of the entire interrelated network.

There is significant overlap and cooperation in Citadel's high frequency group between individuals working on development of alphas or signals and other quantitative research and those working on information technology, trading engines, and other aspects of the infrastructure. Citadel's quantitative and infrastructure teams have worked together in a continuous, cooperative

[1]Signals or "alphas" are mathematical price prediction algorithms or models developed and tested by Citadel.

3

process to develop the high frequency business over a period from 2004 through 2009.

*Malyshev and Kohlmeier*

Malyshev joined Citadel's high frequency group in the fall of 2003. Although he had no training or professional trading experience or training, he had a Ph.D in plasma physics, had previously worked as a management consultant, and had a quantitative background. Kohlmeier was hired into Citadel's finance technology associates program in the information technology (IT) department in July 2002, directly out of graduate school. Kohlmeier joined the high frequency group in January 2004. Prior to joining Citadel, Kohlmeier had no experience in algorithmic or high frequency trading.

Malyshev oversaw every aspect of Citadel's high frequency business, including the building of the IT infrastructure for the high frequency business. Kohlmeier reported to Malyshev from early 2004 until Malyshev resigned in February 2009. Additionally, Malyshev was responsible for recruiting and hiring Citadel's high frequency talent, interfacing with both internal and external recruiters used by Citadel.

Malyshev also worked on Citadel's alphas and was responsible for approving the trading strategies used by Citadel's high frequency group. Kohlmeier made sure the alphas "traded right" and that trading was "robust." While at Citadel, Kohlmeier would often make use of an "alpha" that looked at a weighted midprice and had some predictive elements to it.

Joe Kelley, Richard May, and Brian Stube (as well as three others) reported directly to Kohlmeier and also worked on Citadel's alphas and signals. Kohlmeier conducted weekly meetings with them which included technical discussions of the signals and strategies being

worked on by individuals in the group.

Kohlmeier wrote the code for the Phase Zero HFE System at Citadel, which was the high frequency group's first order entry system and trading engine. The Phase Zero HFE System was based on infrastructure previously used by Citadel to send orders back and forth to trade Korean options. Kohlmeier made changes to that IT system so that it would allow the high frequency group to trade on the National Association of Securities Dealers Automated Quotation System (NASDAQ). The high frequency group made trades through Kohlmeier's Phaze Zero HFE System though, according to Kohlmeier, those trades lost a small amount of money and the system was "turned off."

Malyshev also played a crucial role in the construction of Citadel's high frequency trading platform infrastructure. He provided the requirements for the infrastructure rollout that was completed by Citadel's high frequency team. Malyshev was involved in frequent meetings and was an important part of developing Citadel's infrastructure.

*Citadel's Security Measures to Protect its High Frequency Business*

In order to protect the confidential nature of its high frequency work, Citadel instituted a number of physical and electronic security measures. The physical security measures included limited identification card access to the building and certain floors, security cameras, and a dedicated Citadel security team. The electronic security measures included password protection and encryption of relevant computer systems, computer-access limitations, and a second level of encryption for some of Citadel's source code. Access to high frequency source code was given out on a need-to-know basis only and was strictly limited.

Citadel also used employment agreements as an additional tool in protecting its confidential information related to high frequency trading. Every employee in the high frequency group had to sign a noncompetition agreement at some point during their employment. Citadel employees were also required to sign nonsolicitation and nondisclosure agreements to protect Citadel's business interests and its confidential information.

Because of their important roles at Citadel and their access to confidential information, both Malyshev and Kohlmeier were required to execute noncompetition, nonsolicitation and nondisclosure agreements with Citadel, and they entered into a partnership agreement. Malyshev signed his noncompetition agreement on August 3, 2004, and Kohlmeier signed his noncompetition agreement on April 13, 2005. Malyshev entered into his nondisclosure agreement on January 21, 2004, and Kohlmeier entered into his on April 13, 2005. Malyshev executed the "Citadel Partners Equity Participants, LP Limited Partnership Agreement" on July 21, 2008; Kohlmeier executed the same agreement on July 23, 2008.

The noncompetition agreements signed by Malyshev and Kohlmeier provide in relevant part as follows:

"1. Noncompetition. During my employment with Citadel, and during the Restricted Period following the end of my employment, I agree not to, directly or indirectly, engage in any Competitive Activity.

(a) 'Restricted Period' means the 0, 3, 6 or 9 month period following the end of my employment with Citadel, as elected by Citadel within 10 days

6

following the end of my employment.

(b) 'Competitive Activity' I will be engaging

in a Competitive Activity if:

(I) I become an employee of a

Competitive Enterprise in a capacity I

was in, or provide services that are

similar I provided, or with

responsibilities that are similar to the

responsibilities I had, in each case,

when I was employed by Citadel; or

* * *

(v) I directly or indirectly

become a partner or principal of a

Competitive Enterprise; or

* * *

(vii) I directly or indirectly form, or

acquire greater than a 5% equity, voting,

revenue, income, profit, loss or other

economic interest in a Competitive

Enterprise.

(c) 'Competitive Enterprise' means any business that

(I) engages in any of the investment strategies, trading strategies or any other business activities identical or similar to any of those engaged in by Citadel, or (ii) owns or controls a significant interest in any entity that engages in any of the investment strategies, trading strategies or any other business activities identical or similar to any of those engaged in by Citadel.

* * *

3. Reasonableness of Restrictions. I understand the global nature of Citadel's businesses and the effort Citadel undertakes to develop, preserve and protect its business and competitive advantage. Accordingly, I agree that the scope and duration of the restrictions and limitations described in this Agreement are reasonable and necessary to protect the legitimate business interests of Citadel, even if any provision of Section 1 may limit my ability to earn a livelihood in a business that is identical or similar to the businesses in which Citadel is engaged for some period of time. "

Malyshev and Kohlmeier also signed nonsolicitation agreements in which they agreed not to "directly or indirectly" solicit or induce any "Citadel Employee" to cease employment with Citadel "during [his] employment with Citadel, and during the 12-month period following the end of [his] employment with Citadel." A "Citadel Employee" includes a person who was employed at Citadel at the time of the contact or at any time within the 30-day period "immediately preceding such contact, solicitation, or inducement." The nonsolicitation agreements also prohibited making "any oral or written statement to any third party that disparages, defames, or reflects adversely upon Citadel, or any of its principals, officers, employees or services."

Additionally, Malyshev and Kohlmeier each executed a nondisclosure agreement with Citadel in which they acknowledged that Citadel had "devoted considerable resources in developing its proprietary trade secrets and know-how," and recognized that "such proprietary trade secrets and know-how, as well as all other information relating to Citadel's activities that is not generally known outside of Citadel," is the "key to Citadel's competitive advantage and business." Malyshev and Kohlmeier also acknowledged that "any loss or erosion of Citadel's competitive advantage through the disclosure or improper use" of its trade secrets could have "severe repercussions on Citadel's business." Further, Malyshev and Kohlmeier both agreed that they would "use Confidential Information only as required to perform [their] duties for Citadel (and not for [their] personal benefit or the benefit of any other individual or entity)."

Section 3.1(d) of the partnership agreement executed by Malyshev and Kohlmeier required each partner to "inform the General Partner of all business activities in which he engages at any time prior to eighteen months following such Covered Person's Termination."

Further, Citadel's employee handbook specifies that employees are "strongly discouraged from using any Citadel Communication System to access [their] personal e-Mail account held on third-party e-Mail systems such as Hotmail, private ISP mail servers, etc." Employees with remote access are discouraged from "using non-Citadel e-Mail accounts (i.e., Hotmail, Yahoo, AOL) or other external resources to conduct Citadel business, thereby ensuring that official business is never confused with personal business." The employee handbook demands that former employees protect Citadel's information: "If you leave Citadel, you may not in any way use confidential or proprietary information obtained while working here."

*Malyshev's Plans to Leave Citadel*

According to Malyshev, he thought about having his own high frequency trading company frequently while he was employed by Citadel and began informing others of his desire as early as 2007. Malyshev consulted with attorneys in 2007 concerning his Citadel employment agreements and he spoke with Kohlmeier as early as 2007 about his future ambitions, specifically stating that he wanted to run his own company. By the end of 2007, Malyshev had specifically discussed starting his own trading firm with an attorney. Malyshev continued to think about leaving Citadel and forming his own business throughout 2008. In the first quarter of 2008, Malyshev again discussed the Citadel agreements with attorneys. In February 2008, Kohlmeier informed Malyshev of a conversation that he had with James Yeh, Malyshev's boss and the manager of the high frequency trading business, in which he expressed his desire to work with Malyshev in the future, even if it was outside of Citadel. In 2008, Malyshev had discussions with other Citadel employees about forming his own company, including Kelley, May, and Benjamin Blander. From

mid to late 2008 until his resignation, Malyshev told May that his "dream scenario" was to run his own company. Malyshev told Kelley and May that if he were to start his own business, he would structure it like Jump, a competitor of Citadel's that uses a model called a "bucket shop." In a bucket shop model, the company builds a trading platform and then allows third parties to trade their strategies on it in return for a percentage of their profits.

In mid-2008, Malyshev told Kelley that he planned to leave Citadel and discussed his future plans, including options at other firms and opportunities to build a team. Also in 2008, Malyshev began communicating with recruiters, some of whom recruited for Citadel, in order to build his team for the new venture. By December 2008, Malyshev was 80% certain that he was leaving Citadel in February 2009. He reached out to former Citadel in-house counsel Matthew Hinerfeld to discuss leaving Citadel and forming his own business, and entered into an attorney-client relationship with Hinerfeld on December 6, 2008. Their discussions included Malyshev's employment agreements with Citadel and the possibility of Malyshev leaving Citadel and starting his own business. Specifically, they discussed the possibility of Malyshev starting an independent trading firm and Hinerfeld serving as the general counsel of the firm. Additionally, Malyshev continued to discuss his desire to leave Citadel and form his own business with Citadel employees Kelley, May and Stube.

*Malyshev and Kohlmeier Resign: the Birth of Teza*

Malyshev resigned from Citadel on February 16, 2009, and Kohlmeier resigned the following day. On February 19, 2009, James Thomas, Kelley, May and Stube approached Yeh about resigning. On February 22, 2009, Yeh called Malyshev and informed him that if he had

solicited Thomas, Kelley, May and Stube, Citadel would pursue legal action. Additionally, Yeh asked Malyshev to help persuade them to stay at Citadel, and Malyshev spoke with them. Shortly thereafter, May, Kelley and Stube returned to Citadel.

After his resignation, Malyshev received a letter from Citadel's general counsel, reminding him of his obligation to return all Citadel documents, electronic information and data from his home or personal computers, and then to delete any copies. However, Malyshev failed to return any documents or information to Citadel and retained one of Citadel's confidential profit and loss statements, which contained detailed profit and loss information broken down by high frequency strategy. Yeh testified that this statement would provide a roadmap for people aware of Citadel's trading strategies to compete against Citadel by knowing when, where and how Citadel makes its money in the high frequency business.

Citadel elected a nine-month restricted period following the resignations of Malyshev and Kohlmeier pursuant to the noncompetition agreements. Under those agreements, Malyshev was entitled to a restricted period payment of $30,000 per month and Kohlmeier was entitled to a restricted period payment of $21,000 per month.

During the week that they resigned and during their 30-day nonsolicitation period, Malyshev and Kohlmeier met once at Malyshev's home. They testified that they did not discuss any future business that day, but on March 23, 2009, they again met at Malyshev's home, at which time they discussed a new high frequency business and agreed to go into business together. Three days later, Malyshev, Kohlmeier and Hinerfeld incorporated Pelagicus Group LLC (Pelagicus) in Delaware. Pelagicus is the entity that later became Teza. On April 28, 2009,

Malyshev, Kohlmeier and Hinerfeld formed more entities, including Teza IP, LLC; Teza Technologies, LLC; and Teza Trading LLC.

Citadel learned of Teza's formation on July 6, 2009, and filed an emergency motion for preliminary injunction on July 9, 2009. Additionally, Citadel sought sanctions against Malyshev and Teza upon learning that Malyshev ran commercial scrubbing software on his personal computers and destroyed evidence during the pendency of the instant lawsuit and after the trial court entered an order for the preservation of evidence.

### The Evidentiary Hearing and Trial Court's Findings

An evidentiary hearing was held over several days beginning on September 28, 2009, and the trial court subsequently issued a written memorandum opinion detailing its findings. With respect to Citadel's motion for sanctions, the trial court found that: although Malyshev was a principal and an owner of Teza, the evidence showed that he acted on his own without Teza's approval or authority in scrubbing his computers. As such, the court found that sanctions could not be imposed against Teza for Malyshev's misconduct. The court did, however, find that sanctions were warranted against Malyshev.

Regarding Citadel's motion for a preliminary injunction, the trial court noted that Citadel sought, without prejudice, injunctive relief on counts I, II and V of its first amended complaint. Count I alleged that Malyshev and Kohlmeier violated their noncompetition agreements; count II alleged that Malyshev and Kohlmeier violated their nonsolicitation agreements; and count V alleged breach of fiduciary duty against Malyshev and Kohlmeier. Specifically, Citadel sought the following relief against Malyshev, Kohlmeier and Teza:

"(1) an order enjoining Malyshev and Kohlmeier from any involvement with, or any work for, Teza for a period of nine months following the date the court enters its injunction order, plus any additional period of time for which the court finds that they competed with or breached fiduciary duties to Citadel during their employment;

(2)     an order enjoining Teza from doing any work whatsoever for a period of nine months from the date the court enters the injunction order, and directing that all work done to date be destroyed; and

(3) an order enjoining all defendants from soliciting any Citadel employees for twelve months from the date the Court enters the injunction order."

The trial court further found that Malyshev and Kohlmeier, by forming, working for and owning Teza, engaged in competitive activities as defined in the noncompetition agreements. Additionally, the court found that Malyshev and Kohlmeier violated the nonsolicitation agreements in that Malyshev induced Kohlmeier to leave Citadel or that they solicited each other to form Teza prior to the expiration of the nonsolicitation period. The trial court did not make a finding on the merits of Citadel's breach of fiduciary duties claims.

As a result of its findings, the trial court partially granted Citadel's motion for preliminary injunction against the defendants as follows: (1) Malyshev, Kohlmeier and Teza were enjoined from engaging in any competitive activity as defined by the noncompetition agreements beginning

with the date of the order (October 16, 2009) and ending at the termination of Malyshev's and Kohlmeier's restricted periods as set forth in the noncompetition agreements and Teza was enjoined for the longer of the two periods; and (2) Malyshev and Kohlmeier were enjoined from directly or indirectly hiring, soliciting, or inducing any Citadel employee, as defined in the nonsolicitation agreements, to leave Citadel for the 12-month period as set forth in the agreements. In so finding, the trial court noted that neither the noncompetition nor the nonsolicitation agreements contained provisions for an extension of the restriction period based on a violation of their terms. This interlocutory appeal and cross-appeal followed.

DISCUSSION

On appeal, Citadel contends that the trial court erred in granting preliminary injunctive relief lasting only through November 16, 2009, against defendants. Citadel seeks an injunction that ensures compliance with the full nine-month, noncompetition period and argues that the relief sought: (1) is consistent with Illinois law; (2) is consistent with the rule in the majority of other jurisdictions; and (3) is consistent with common sense, logic, and public policy. Additionally, Citadel contends that the facts of this case illustrate why courts of equity must have the power to enforce the entire agreed-upon noncompetition period.

In their cross-appeal, defendants contend that the trial court erred by issuing an injunction based on violations of the noncompetition agreements for the following reasons: (1) the court's interpretation of the agreements improperly restricts defendants' postemployment activities; (2) the court's ruling ignores the plain language of the agreements, violates the law and leads to absurd results; (3) the court's interpretation of the agreements violate public policy; and (4) Teza

is not a competitive enterprise. Additionally, defendants contend that the court erred when it entered a preliminary injunction based on the nonsolicitation agreements.

A preliminary injunction is a provisional remedy granted to preserve the status quo pending a hearing on the merits of a case. See Stenstrom Petroleum Services Group, Inc. v. Mesch, 375 Ill. App. 3d 1077, 1089 (2007). It is an " 'extraordinary remedy used only in situations where an extreme emergency exists and serious harm would result in the absence of an injunction.' " Stenstrom Petroleum, 375 Ill. App. 3d at 1089, quoting Audio Properties, Inc. v. Kovach, 275 Ill. App. 3d 145, 147 (1995). The party seeking a preliminary injunction is required to demonstrate (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. Mohanty v. St. John Heart Clinic, S.C., 225 Ill. 2d 52, 62 (2006). A decision to grant or deny a preliminary injunction is generally reviewed for an abuse of discretion. Mohanty, 225 Ill. 2d at 62-63. However, whether injunctive relief should issue to enforce a restrictive covenant not to compete in an employment contract depends upon the validity of the covenant, which is a question of law. Mohanty, 225 Ill. 2d at 63.

An injunction will not be set aside on review unless the trial court abuses its discretion and holds contrary to the manifest weight of the evidence. Prairie Eye Center, Ltd. v. Butler, 329 Ill. App. 3d 293, 299 (2002), citing R.L. Polk & Co. v. Ryan, 296 Ill. App. 3d 132, 142 (1998). Additionally, courts strictly construe and interpret covenants not to compete, and any doubts or ambiguities must be resolved against the restrictions. Marwaha v. Woodridge Clinic, S.C., 339 Ill. App. 3d 291, 293 (2003); Bloomington Urological Associates v. Scaglia, 292 Ill. App. 3d 793,

16

1-09-2828

798 (1997).

Citadel contends that the trial court should have extended the restriction period in the noncompetition agreements so that it would have received a full nine months as contemplated under the agreement. Citadel argues that the trial court's refusal to enjoin the defendants for the full nine months was inconsistent with this court's decision in Electronic Support Systems, Inc. v. Schattke, 70 Ill. App. 3d 469 (1979), and is inconsistent with "equity, common sense and good public policy." We disagree.

In Electronic Systems, the employer sought preliminary injunctive relief to enforce the restrictive covenant in an employment contract. Electronic Systems, 70 Ill. App. 3d at 469-70. On November 9, 1976, the parties entered into an employment contract, which contained a restrictive covenant not to compete for 18 months after termination of employment. Electronic Systems, 70 Ill. App. 3d at 470. On December 10, 1976, defendant's employment was terminated, and the 18-month restriction began that day. Electronic Systems, 70 Ill. App. 3d at 470. Defendant subsequently engaged in conduct that violated the restrictive covenant during the 18-month restriction period. Electronic Systems, 70 Ill. App. 3d at 470. Plaintiff filed its complaint on August 29, 1978, more than 20 months after defendant's employment terminated, contending that defendant violated the noncompetition agreement within the 18 months following his termination, and seeking injunctive relief. Electronic Systems, 70 Ill. App. 3d at 470. As part of its evidence, plaintiff introduced a letter written to defendant in January 1978, advising him of his violation of the restrictive covenant. Electronic Systems, 70 Ill. App. 3d at 470. The court declined to extend the effect of the contract period, even though defendant allegedly breached his

17

covenant not to compete within the 18-month period restriction period. Electronic Systems, 70 Ill. App. 3d at 471. In so holding, the court noted that in certain instances, injunctive relief might be appropriate even after the expiration of the contractual period, but found that, under the circumstances presented, the grant of a preliminary injunction after the expiration of the restrictive covenant would have been an unreasonable restriction of trade. Electronic Systems, 70 Ill. App. 3d at 471.[2]

We find that the trial court's decision was not contrary to the decision of this court in Electronic Systems, and despite Citadel's contention to the contrary, it is factually similar to Stenstrom. The trial court, while finding that defendants breached their noncompetition agreements, noted that the agreements did not provide for any extension of the restrictive period beyond that which was bargained for. In so doing, the trial court cited the Second District's opinion in Stenstrom as support for its finding.

In Stenstrom, the trial court enjoined the defendant for six months after he left the plaintiff's employment under the terms of their restrictive covenant. Stenstrom, 375 Ill. App. 3d at 1087. On appeal, Stenstrom contended, as does Citadel in the instant case, that the six months should have commenced as of the date the preliminary injunction was entered because otherwise, the injunction would apply to conduct that had already occurred, and it was entitled to the full six-month period of noncompetition for which it bargained. Stenstrom, 375 Ill. App. 3d at 1087-88.

In so arguing, Stenstrom relied upon the Fourth District's opinion in Prairie Eye Center,

---

[2]Of note, the Electronic Systems court did not specify what instances would justify an extension of the contractual restrictive period in a noncompetition agreement.

18

1-09-2828

Ltd. v. Butler, 329 Ill. App. 3d 293 (2002). In that case, the defendant entered into a two-year covenant not to compete. Prairie Eye Center, 329 Ill. App. 3d at 295. The trial court, after finding the covenant valid and enforceable, entered a preliminary injunction in 1999, finding that the defendant repeatedly violated his covenant not to compete. Prairie Eye Center, 329 Ill. App. 3d at 296. Following trial, the court entered a permanent injunction in 2000, in which it extended the restrictive covenant by two years. Prairie Eye Center, 329 Ill. App. 3d at 298. On appeal, the appellate court affirmed the trial court's judgment, additionally finding that the language of the covenant provided for an extension of the restriction upon proof of its breach. Prairie Eye Center, 329 Ill. App. 3d at 304-05.

The court in Stenstrom specifically found Prairie Eye Center to be distinguishable because the language within the restrictive covenant at issue in Prairie Eye Center provided for extension of its terms. See Prairie Eye Center, 329 Ill. App. 3d at 304-05. Stenstrom's noncompetition agreement with Mesch only provided for a six-month restrictive agreement beginning on the termination of employment date and contained no provision for any extension of that restrictive period or modification of the commencement date. Stenstrom, 375 Ill. App. 3d at 1088.

Turning to the case at bar, a similar conclusion is apparent from the evidence as presented in this case. Here, Citadel's noncompetition agreements allowed it to opt for a restrictive period of zero, three, six or nine months after an employee ceased working for Citadel. Citadel opted for a nine-month restrictive period for both Malyshev and Kohlmeier, commencing on February 16, 2009, and February 17, 2009, respectively. Under the plain language of the restrictive covenants, they each terminated, by their own terms, nine months after termination of employment, or

19

November 16, 2009, for Malyshev, and November 17, 2009, for Kohlmeier. The agreements contained no provision allowing for an extension of time or modification of the commencement date. Accordingly, the trial court granted the parties the benefit of their bargain, a restrictive covenant that would end nine months after the termination of employment. This conclusion is reinforced by the rule that restrictive covenants are to be strictly construed. See Marwaha, 339 Ill. App. 3d at 294. Thus, we conclude that the trial court's ruling was not against the manifest weight of the evidence and that no extension of the injunction period was warranted.

We need not address the merits of defendants' cross-appeal as they have conceded that our disposition of Citadel's appeal renders their issues moot as the preliminary injunction has now expired on its own terms. See Multiut Corp. v. Draiman, 359 Ill. App. 3d 527, 543 (2005).

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINN and COLEMAN, JJ., concur.

1-09-2828

REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each Case)

| Please Use Following Form: | |
|---|---|
| Complete TITLE of Case | CITADEL INVESTMENT GROUP, LLC,<br><br>Plaintiff-Appellant and Cross-Appellee,<br><br>v.<br><br>TEZA TECHNOLOGIES LLC, a Delaware Corporation, MIKHAIL MALYSHEV, and JACE KOHLMEIER,<br><br>Defendants-Appellees and Cross-Appellants. |
| Docket No.<br><br>COURT<br><br>Opinion Filed | No. 1-09-2828<br>Appellate Court of Illinois<br>First District, THIRD Division<br><br>February 24 , 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE STEELE delivered the opinion of the court:<br><br>Quinn and Coleman, JJ.,                    concur<br><br>dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br>Circuit Court of Cook County, Chancery Division<br>The Honorable      Mary K. Rochford      , Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br>Attorney for **Plaintiff-Appellant and Cross-Appellee**:  **KIRKLAND & ELLIS LLP**, of Chicago, IL<br>Michael P. Foradas, P.C., Brian D. Sieve, P.C., Mark J. Nomellini, and Michael B. Slade (of Counsel)<br>**WILLIAMS MONTGOMERY & JOHN, LTD.**, of Chicago, IL<br>C. Barry Montgomery, Alyssa M. Reiter, and Steven J. Roeder (of Counsel)<br><br>Attorneys for **Defendants-Appellees and Cross-Appellants**:  **JENNER & BLOCK LLP,** of Chicago, IL<br>Chris C. Gair, Michael T. Brody, Gregory M. Boyle, and Seth A. Travis (of Counsel) |