No. 2--07--0504          Filed: 9-7-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| STENSTROM PETROLEUM SERVICES GROUP, INC., | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellant and Cross-Appellee, | ) ) ) ) | |
| v. | ) ) | No. 07--CH--366 |
| ROBERT MESCH, | ) ) ) | |
| Defendant-Appellee and Cross-Appellant | ) ) ) | |
| (Precision Petroleum Installation, Inc., Defendant-Appellee). | ) ) ) | Honorable Ronald L. Pirrello, Judge, Presiding. |

JUSTICE CALLUM delivered the opinion of the court:

I. INTRODUCTION

Plaintiff, Stenstrom Petroleum Services Group, Inc., sued defendants, Robert Mesch (its former employee) and Precision Petroleum Installation, Inc. (New PPI) (Mesch's current employer), alleging, inter alia, breach of a covenant not to compete, violations of the Illinois Trade Secrets Act (Trade Secrets Act or Act) (765 ILCS 1065/1 et seq. (West 2006)), and breach of fiduciary duty. Stenstrom sought an injunction and damages. The trial court granted Stenstrom a preliminary injunction to enforce the covenant not to compete and denied relief on the other grounds alleged in its complaint. Stenstrom appeals, arguing that the trial court erred in determining the

commencement date of the preliminary injunction and in declining to enjoin Mesch and New PPI for breach of fiduciary duty and violations of the Act. Mesch cross-appeals, arguing that the covenant not to compete is unenforceable. We affirm.

## II. BACKGROUND

Stenstrom filed its complaint on March 7, 2007. The trial court entered a temporary restraining order (TRO) on March 8, 2007. The court heard testimony on Stenstrom's petition for a preliminary injunction on March 16 and April 3, 2007. It entered the preliminary injunction on April 25, 2007. The following testimony was presented at the hearing on the preliminary injunction.

### A. Mesch

Mesch began working in the petroleum industry in 1974, installing equipment such as underground storage tanks and petroleum piping systems. For subsequent employers, Mesch rebuilt damaged gasoline dispensers and pumps, maintained and repaired service station equipment, and worked as a warehouse manager and a purchasing manager. Mesch also performed outside sales and, starting in 1986, engaged in estimating and project management.

Stenstrom installs and maintains equipment in the petroleum industry, including the installation and removal of petroleum tanks, pumps, and electronics. It also repairs such equipment. A separate Stenstrom company performs excavation work.

On June 18, 2003, Stenstrom purchased Precision Petroleum, Inc. (Old PPI). Mesch had worked for Old PPI for about seven years. On the same day that it purchased Old PPI, Stenstrom hired Mesch, who signed a noncompete agreement and a confidentiality agreement. Mesch performed the same work for Stenstrom that he had for Old PPI, working as an estimator and project manager.

The noncompete agreement, or restrictive covenant, Mesch signed appears in a document entitled "Petroleum Services Group Training Agreement," at paragraph 3. The covenant provides:

"RESTRICTIVE COVENANT. Employee, as additional consideration for the training, classroom study and materials provided by the Company, shall not for a period of six (6) months from the date of termination of his employment with the Company, engage directly or indirectly in any capacity in the excavation or equipment repair field in the counties of Winnebago and Boone (which constitute the Company's trade area or areas), except with Company's written consent. In addition to any other rights or remedies available to the Company for breach of this Agreement, the Company shall be entitled to enforcement by preliminary restraining order and injunction. In the event the Company is forced to take legal action against Employee under this Agreement, all of the Company's costs and expenses of such action, including reasonable [attorney] fees, shall be paid by Employee." (Emphasis added.)

Mesch worked for Stenstrom between June 2003 and December 2006. He estimated petroleum jobs, bid on the jobs, and managed successful bids. During his tenure with Stenstrom, Mesch bid on 378 jobs and managed 121 jobs.

He acknowledged that, while at Stenstrom, he received training in the Timberline and Excel computer programs. The Timberline database limits employees' access to only those folders that they are granted permission to use. Mesch stated that he merely "dabbled" in using the program. He denied using Timberline to prepare bids in December 2006. He did access it, however, to retrieve job costs and reports.

In calculating his bids, Mesch used an Excel spreadsheet and not the Timberline estimating program that other Stenstrom project managers used. Addressing the Excel spreadsheet, Mesch explained that it was first developed by someone at Old PPI. It began as a "crude spreadsheet, which was just quantities, list prices, some discounts, and the way the owner of the company put it, he wanted something that was better than just doing a bid off a napkin." Mesch continued to use the spreadsheet in estimating projects, with "great revisions and modifications" that he incorporated into it.

Mesch described his spreadsheet calculations as follows. The material and labor worksheet contains part numbers, quantities, list prices, discounts off of list prices, and extended pricing. The spreadsheet also contains markups to net prices. Mesch manually entered quantities, subcontractor bids, labor hours, and markup percentages. The "bid" tab incorporates the material and labor data. Mesch manually revised entries concerning the scope of the work.

On December 22, 2006, Mesch resigned from his job with Stenstrom. He last worked for Stenstrom on December 26, 2006. His salary at that time was $73,840. Mesch started copying Stenstrom files in early-to-mid 2006 for the purpose of working at home on Stenstrom's behalf. From this period through his termination date, he did not use any of the copied materials to prepare bids for any entity other than Stenstrom.

After he left Stenstrom, Mesch commenced working for a newly formed entity--New PPI. Mesch testified that all of New PPI's customers are also Stenstrom customers and that New PPI has bid on jobs only for Stenstrom customers. He also stated that New PPI has discussed bids only with Stenstrom customers. New PPI's logo is similar to Old PPI's logo. Mesch conceded that he referenced a computer file of the Old PPI logo, which he copied from Stenstrom, in order to create

the New PPI logo. Mesch agreed that he currently has an unwritten agreement with New PPI under which he will receive 20% of its net profits in addition to his salary. His job title is project manager/ estimator. Mesch denied that he is an officer, director, or shareholder of New PPI.

Mesch explained that New PPI purchases its equipment from a distributor. Stenstrom, however, purchases directly from manufacturers. According to Mesch, New PPI does not obtain the same prices from manufacturers as does Stenstrom. Stenstrom receives much deeper discounts than New PPI because it does not go through a distributor, which takes a markup. To calculate bids at New PPI, Mesch obtained a list of manufacturer discounts from Source North America and incorporated the data into the Excel spreadsheet, thus changing the discounts.

Mesch stated that New PPI, unlike Stenstrom, does not perform any excavation work or equipment repair work. It relies instead on subcontractors. Mesch testified that Stenstrom does the majority of its own concrete work and excavation work. As to electrical contractors, Mesch has used at New PPI contractors that he used at Stenstrom and previously at Old PPI.

According to Mesch, in September 2006, he copied a subdirectory entitled "Estimating" from Stenstrom's server onto his personal Dell Jukebox, a music player. He testified that he did so with his supervisor's knowledge. The directory contained folders that, in turn, contained subfolders for various jobs. Mesch testified that not all of the jobs involved clients, but included entities for which Stenstrom had prepared unsuccessful bids. In addition to the music player, Mesch conceded that he copied Stenstrom information onto a travel drive on December 1, 2006. Mesch copied the files from the music player and travel drive to his home computer and then onto two DVDs. He copied the information for the purpose of using it for New PPI and conceded that he did access the information while working for New PPI. He did not use the files from the music player at New PPI, but only the

files from the travel drive. Mesch testified that many of the files were from Old PPI and that Stenstrom received them because he brought them to Stenstrom. He conceded that the files were on a computer that Stenstrom purchased. Mesch destroyed the DVDs before he left Stenstrom. Further, Mesch conceded that some of the data he copied from Stenstrom he used to prepare bids at New PPI. He did this on his own and not at New PPI's request.

As of the hearing on the preliminary injunction, Mesch no longer possessed the computer files he copied from Stenstrom's computers. Within three days after the TRO was issued, Mesch turned over the Stenstrom data he had copied. Mesch further testified that he no longer had the spreadsheet available to him to prepare bids. However, he testified that he could reproduce it in two to three days because he developed the original. He would not have to rely upon any information from Stenstrom in order to recreate it. All of the information he requires "is readily available from manufacturers." Also, he knows from experience the discounts that Stenstrom obtains from its key suppliers. He can recite many of the discounts from memory.

While working for Old PPI, Mesch prepared six bids for State Oil. State Oil was one of Old PPI's better customers. His contact at the company was Jim Peters. Mesch also prepared 12 bids for Road Ranger. His contact there was John Carabelli. Road Ranger was Old PPI's largest customer.

Mesch further testified that Stenstrom's Road Ranger Hampshire computer file is in New PPI's Road Ranger Hampshire computer file. Mesch conceded that he bid on Road Ranger's Hampshire project while at Stenstrom and then bid on a larger version of that project while working at New PPI. Mesch also conceded that he successfully bid on a job for State Oil, the North Chicago

project, for New PPI after having bid on the project for Stenstrom. Mesch testified that he used Stenstrom drawings to make the "CAD" drawings for New PPI to submit with its bid.

New PPI's only successful bid as of the hearing date was the State Oil North Chicago project. Mesch bid on the project in September 2006 for Stenstrom. That bid was rejected. After he left Stenstrom, Mesch called Jim Peters and informed him that he had left Stenstrom. While working at New PPI, Mesch re-bid on the project, at Jim Peters' request. New PPI's bid was higher than Stenstrom's bid. At the time he left Stenstrom, State Oil had not yet rejected Stenstrom's bid for the North Chicago job. Comparing Stenstrom's unsuccessful bid with New PPI's successful bid, Mesch testified that the only differences are the names on the bids, the prices, and the payment terms.

Mesch conceded that Stenstrom's name appears in several places in another bid he submitted on behalf of New PPI. Mesch also conceded that while working at New PPI he consulted Stenstrom bid information to obtain subcontractor electrical, canopy, and tank costs for bids. Mesch used the spreadsheet at New PPI with the new company's costs substituted in the place of Stenstrom's costs.

## B. David Sockness

David Sockness, president of Stenstrom and of Stenstrom Excavation and Blacktop, testified on Stenstrom's behalf that both companies are owned by the same holding company. Sockness manages Stenstrom. He explained that the company, which has been in the petroleum business since 1982, installs petroleum equipment, such as tanks, piping, dispensers, islands, point-of-sale devices, tank-monitoring equipment, submersible pumps, and manholes. It also services the equipment it installs and places concrete. Stenstrom operates within a 100-mile radius of Rockford. In some cases, the company performs work outside this area.

Sockness acknowledged that Stenstrom uses a spreadsheet to create its bids and that the information therein is not contained in the final bids submitted to customers. This information is valuable to Stenstrom. It includes all of its pricing, including material, labor, and equipment, and includes manufacturer discounts, vendor discounts, and profit margins. It also contains labor hours for jobs and labor rates. The spreadsheet can be used to determine future Stenstrom bids. Two current bidders use the spreadsheet. Stenstrom purchased the spreadsheet when it purchased Old PPI. It also purchased the Old PPI logo. According to Sockness, New PPI's logo is the same as Old PPI's logo. Sockness is unaware if Stenstrom registered Old PPI's logo or trade name. Sockness further testified that Stenstrom is moving away from the Timberline program and toward using the spreadsheet to bid on jobs.

Stenstrom's largest customers are Kelley Williamson, Road Ranger, and State Oil. They comprise about 40% of Stenstrom's petroleum installation business and 40% of its petroleum service business. Old PPI had a strong relationship with Road Ranger, and this is one of the reasons Stenstrom bought Old PPI. This was also the case with State Oil. Stenstrom's second tier of clients includes Vista Marketing and Combined Oil. They comprise about 10% of Stenstrom's installation business and 10% of its service business. Stenstrom has never lost a major client.

Stenstrom handles all of Kelley Williamson's and Vista's petroleum installation business. It performs about 50% of Road Ranger's local petroleum installation business. According to Sockness, Stenstrom maintains its relationships with its customers via marketing campaigns, personal calls, personal visits, and business meetings. Its client entertainment budget is $20,000. Sockness conceded that Road Ranger and State Oil get competitive bids from other companies for installation work. Also, Stenstrom does not have any agreement with Kelley Williamson to be its

exclusive provider of installation services. Further, when Stenstrom purchased Old PPI, there was no promise by Road Ranger that a certain percentage of its business would thereafter go to Stenstrom.

Stenstrom usually uses Nicholson Electric as its electrician. Al Hoover owns the company. New PPI also uses Nicholson Electric. Mesch would have had contact with Hoover at Nicholson Electric while Mesch worked at Stenstrom and would have developed a relationship with him. Sockness conceded that he is not aware of any reason Mesch should not go to Nicholson Electric to have electrical work done for New PPI.

### C. Brian Cotti

Brian Cotti is the information technology manager for the Stenstrom companies. He testified that Stenstrom takes several steps to keep its information confidential. They include utilizing a firewall at the perimeter of its computer network; "NTFS" permissions that are built into the Windows operating system to determine whether a user is allowed to modify, open, or delete documents; computer authentication; and user authentication, which requires that a user log in to the network with a valid identification and password. Cotti further explained that the Timberline database similarly limits employees' access to information. The server room at Stenstrom is accessible only by key, and the physical job files are accessible only by key or key code.

Cotti further testified that he ran a log of Timberline access and that the log showed that Mesch attempted to run tasks on Timberline, some of which failed. The failures occurred because Mesch did not have appropriate permissions to complete the tasks. Mesch was attempting to print a certain report.

### D. Robert Rowald

Robert Rowald is a systems administrator and forensic examiner at Trekk Design, where he is in charge of the computer systems, servers, work stations, and related equipment, as well as forensic examinations. He holds several certifications and teaches certification courses. Rowald testified that a forensic copy is a bit-for-bit copy of a computer file, unlike a CD or DVD, which will change the last access date and modified date and will not show slack space, the area where files have been deleted, or unallocated space. Rowald made forensic copies for Stenstrom of one of its hard drives, a home hard drive, an external drive, and two DVDs. He was unable to make a forensic copy of a Dell DJ MP3 player, but did make a standard copy of the information on that device.

Rowald also utilized Beyond Compare software to compare the binary codes in software files. He testified that the industry standard above which a work is considered definitely derivative is 70%. Comparing a "dwg" file called "Ranger Hampshire - Line Repair," dated September 21, 2005, from the Dell DJ, with "Ranger Hampshire - D-S-L Gas Island Config.," dated February 17, 2007, from the business hard drive, revealed that well over 70% of the data lines (i.e., zeros and ones) matched. Rowald explained that one could not redraw a "CAD" drawing by hand and have it match as much as these files did. According to Rowald, the only way to get this many lines to match is to make a file from another file.

Rowald also compared a file named "Ranger Hampshire - Line Repair," dated September 21, 2005, from the Dell DJ, with a file called "Ranger Hampshire - Diesel Lane Conversion," dated February 15, 2007, from the business hard drive, and he testified that the match rate was significantly over 70%: 5,242 lines matched and 101 did not.

Additional exhibits of "data compares" were admitted into evidence. The parties stipulated that one set of files came from Mesch's/New PPI's computers; that the comparisons compare Dell

DJ documents with Stenstrom hard drive documents; and that they all have match rates above 85%.


### E. James Peters

James Peters, State Oil Company's general manager, testified on defendants' behalf that State Oil is a petroleum distributor that owns gas stations, the majority of which are in the Chicago and Lake County areas. Some are also in Boone and Winnebago Counties. Peters testified that he has known Mesch for 20 years. He came to know Mesch because Mesch's father worked for a company owned by State Oil.

Peters testified that State Oil did business with Old PPI. Peters developed a business relationship with Mesch as a result. They also developed a personal relationship, as they became friends. State Oil did business with Stenstrom after Stenstrom purchased Old PPI. According to Peters, Mesch's employment with Stenstrom after the Old PPI purchase was a factor in his decision to do business with Stenstrom. He explained that he had never done business with Stenstrom prior to this time and that, when he found out that Mesch would be working for Stenstrom, he knew that he would be dependable.

Peters explained that, for each of its jobs, State Oil receives about three bids. Peters selects the winning bid on the grounds of price and familiarity of entities and people, even if the result is selecting a higher bid. Mesch is one person with whom Peters is comfortable working.

In about November 2006, Mesch informed Peters that he was leaving Stenstrom to work at New PPI. He asked if State Oil "would support him in the bidding process." Since joining New PPI, Mesch submitted to State Oil a bid for the North Chicago project. Mesch submitted the bid at Peters'

request. Peters currently sends his repair work almost exclusively to Stenstrom. According to Peters, Mesch has not attempted to secure service-related repair work for New PPI.

### F. John Carabelli

John Carabelli, vice president of construction at Road Ranger, testified on defendants' behalf that he has known Mesch for nine years. They met when Mesch worked at Old PPI. Carabelli developed a degree of trust and confidence in the work Mesch performed for Road Ranger. Part of the basis for continuing to do business with Stenstrom was the fact that Mesch worked there. Between 2003 and 2006, Road Ranger did not exclusively use Stenstrom for installation work. For the last three to four years, most of Road Ranger's projects have been done on a bid basis as opposed to a cost-plus basis. In December 2006, Mesch informed Carabelli that he was leaving Stenstrom to work for New PPI. Since January 2007, Road Ranger has received bids from New PPI, at Carabelli's request. As to the Hampshire project bid, it has not been determined if New PPI will get the job. Carabelli further testified that he has provided Mesch with "AutoCAD" drawings for gas stations so that Mesch could submit bids to Carabelli.

### G. Trial Court's Order

On April 9, 2007, the trial court issued a memorandum opinion granting in part and denying in part Stenstrom's petition for a preliminary injunction. Addressing the covenant not to compete, the court found that it was reasonable in scope and time and supported by adequate consideration. Accordingly, it found that Stenstrom was entitled to injunctive relief in Winnebago and Boone Counties, "for whatever time remains on the covenant." As to the remaining counts, the court found "either" that Stenstrom failed to show a likelihood of prevailing on the merits "or that there is ample

legal remedy available for the cause of action examined." It denied Stenstrom relief against New PPI.

On April 25, 2007, the court entered the injunction in conformance with its opinion. Finding that Stenstrom had met the requirements for a preliminary injunction for violations of the restrictive covenant, the trial court enjoined Mesch from "performing, directly or indirectly, in any capacity, petroleum excavation or equipment repair work in Boone and Winnebago Counties for a period of six (6) months from the date of the termination of his employment" with Stenstrom. As to Stenstrom's claims of breach of fiduciary duty and violations of the Act, the court found that Stenstrom failed to show a likelihood of prevailing on the merits "and/or" a lack of an adequate remedy at law. Finally, the court found that Stenstrom "failed to meet its burden" to obtain an injunction against New PPI. Stenstrom timely appealed, and Mesch timely cross-appealed.

### III. ANALYSIS

#### A. Stenstrom's Appeal

##### 1. Breach of Restrictive Covenant Claim

In its appeal, Stenstrom argues first that the trial court erred in enjoining Mesch, based upon the restrictive covenant, for six months from the date he left Stenstrom's employment. Stenstrom contends that the six months should have commenced as of the date Mesch ceased breaching the restrictive covenant--March 8, 2007, the date the TRO was entered. Stenstrom reasons that, otherwise, the injunction will apply to conduct that has already occurred. It argues that it is entitled to the full six-month period of noncompetition for which it bargained.

Stenstrom relies on Prairie Eye Center, Ltd. v. Butler, 329 Ill. App. 3d 293 (2002). In that case, the defendant entered into a two-year restrictive covenant. The trial court, upon finding the

covenant valid and enforceable, entered a preliminary injunction in 1999, finding that the defendant repeatedly violated his covenant not to compete. Following trial, the court entered a permanent injunction in 2000, extending the covenant by two years. On appeal, the court affirmed the trial court's judgment.

We find Prairie Eye Center distinguishable because the covenant in that case provided that, upon breach of the covenant, the noncompetition period would extend by a time equal to the period beginning when the violation commenced and ending when the activities constituting the violation terminated. As the court noted, "the agreement itself provides for an extension of the restriction upon proof of its breach." Prairie Eye Center, 329 Ill. App. 3d at 305. Here, in contrast, the restrictive covenant provides that Mesch "shall not for a period of six (6) months from the date of termination of his employment with the Company" work in the excavation or repair field in Stenstrom's trade area. (Emphasis added.) There is no provision in the agreement for an extension of this period or any modification of the commencement date.

We reject Stenstrom's argument that the Prairie Eye Center court's holding was an alternative one and not a necessary requirement for granting relief in that case. Our review of the decision does not lead us to conclude that the court intended such a reading. In explaining its holding, the court first contrasted the purpose of monetary damages as opposed to injunctive relief. Prairie Eye Center, 329 Ill. App. 3d at 304. The court then elaborated that the injunction gave the employer the agreed-upon period of noncompetition. Prairie Eye Center, 329 Ill. App. 3d at 304. Notwithstanding the use of the word "further" in the paragraph containing the holding upon which we rely, the Prairie Eye Center court clearly rejected the employee's argument that the trial court erred in awarding both monetary damages and injunctive relief for an additional two-year term based on the restrictive

-14-

covenant. In addition to providing for an extension, the covenant in that case also contemplated the assessment of damages. Prairie Eye Center, 329 Ill. App. 3d at 304. The court concluded its opinion by stating that "[t]he trial court simply enforced the parties' agreement." Prairie Eye Center, 329 Ill. App. 3d at 305.

In summary, we reject Stenstrom's argument that the trial court erred in enjoining Mesch with the commencement date as his last day of employment with Stenstrom.

### 2. Trade Secrets Act Claim Against Mesch

Next, Stenstrom argues that the trial court erred in denying it a preliminary injunction against Mesch based on violations of the Trade Secrets Act. In its complaint, Stenstrom alleged that its confidential information constitutes trade secrets under the Act and that it has exercised reasonable efforts to maintain the secrecy and confidentiality of its information. It further alleged that this information is not generally known by its competitors and, if known, would confer an economic benefit to them. According to Stenstrom, Mesch knew that its confidential information constituted trade secrets and he disclosed, misappropriated, and misused the secrets for his own benefit, resulting in injury to Stenstrom. Stenstrom requested injunctive relief, as well as damages, attorney fees, and an order directing Mesch to return to it all confidential information in his possession or control.

A preliminary injunction is a provisional remedy granted to preserve the status quo pending a hearing on the merits of a case. It is "an extraordinary remedy used only in situations where an extreme emergency exists and serious harm would result in the absence of an injunction." Audio Properties, Inc. v. Kovach, 275 Ill. App. 3d 145, 147 (1995). To obtain a preliminary injunction, a party must establish that: (1) the party possesses a clear right or interest needing protection, such as confidential information; (2) the party has no adequate remedy at law; (3) irreparable harm will result

if the preliminary injunction is not granted; and (4) there is a reasonable likelihood of success on the merits. Hanchett Paper Co. v. Melchiorre, 341 Ill. App. 3d 345, 351 (2003); see also Appelbaum v. Appelbaum, 355 Ill. App. 3d 926, 933 (2005). "Because a preliminary injunction is designed to preserve the status quo pending a decision on the merits, the plaintiff need not carry the same burden of proof that is required to support the ultimate issue." LSBZ, Inc. v. Brokis, 237 Ill. App. 3d 415, 425 (1992); see also Shapiro v. Regent Printing Co., 192 Ill. App. 3d 1005, 1009-10 (1989) ("purpose of a preliminary injunction is to raise a fair question as to the existence of a right needing protection, not to decide controverted facts or the ultimate merits"). To satisfy the first and fourth requirements, "a plaintiff need only raise a fair question as to the existence of the right which [it] claims and lead the court to believe that [it] will probably be entitled to the relief requested if the proof sustains [its] allegations." LSBZ, 237 Ill. App. 3d at 425. "On review, we will not disturb a trial court's decision to grant a preliminary injunction, absent an abuse of discretion." Hanchett Paper, 341 Ill. App. 3d at 351.

The trial court found that Stenstrom failed to establish a likelihood of prevailing on the merits of its Trade Secrets Act claim against Mesch "and/or" that it failed to establish that there is no adequate legal remedy available.

### a. Protectable Interest and Likelihood of Success on the Merits

We begin our analysis by examining whether Stentrom has a protectable interest. Under Illinois law, an employer's trade secrets are a protectable interest. See Liebert Corp. v. Mazur, 357 Ill. App. 3d 265, 276 (2005).

The Act provides, in relevant part:

" 'Trade secret' means information, including but not limited to, technical, or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its

secrecy or confidentiality." 765 ILCS 1065/2(d) (West 2004).

Thus, a plaintiff must meet two requirements to show that its information is a trade secret under the Act. First, it must show that the information was sufficiently secret to give it a competitive advantage. 765 ILCS 1065/2(d)(1) (West 2004); Liebert, 357 Ill. App. 3d at 276. Second, it must show that it took affirmative measures to prevent others from acquiring or using the information. 765 ILCS 1065/2(d)(2) (West 2004); Liebert, 357 Ill. App. 3d at 276.

In addition to the Act's requirements, when determining whether a trade secret exists courts often consider six common-law factors derived from section 757 of the Restatement (First) of Torts. See, e.g., ILG Industries, Inc. v. Scott, 49 Ill. 2d 88, 93 (1971), citing Restatement (First) of Torts §757, Comment b, at 6 (1939); see also Liebert, 357 Ill. App. 3d at 276-77. They include: (1) the extent to which the information is known outside the plaintiff's business; (2) the extent to which it is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and to the plaintiff's competitors; (5) the amount of effort or money expended by the

plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Liebert, 357 Ill. App. 3d at 277.

The protection afforded trade secrets reflects a balancing of conflicting social and economic interests. ILG Industries, 49 Ill. 2d at 93. Information that is generally known or understood within an industry, even if not known to the public at large, does not qualify as a trade secret. Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 722 (7th Cir. 2003). Information that is derived from public sources but requires laborious accumulation, culling, and/or analysis of the public information can, however, still qualify as a trade secret. See United States Gypsum Co. v. LaFarge North America, Inc., No. 03--C--6027, slip op. at 14 (N.D. Ill. April 3, 2007). In other words, where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means. Delta Medical Systems v. Mid-America Medical Systems, Inc., 331 Ill. App. 3d 777, 791 (2002). "Nevertheless, in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his or her chosen occupation." Delta Medical Systems, 331 Ill. App. 3d at 791. Where information can be readily duplicated without considerable time, effort, or expense, it is not a trade secret. Hamer Holding Group, Inc. v. Elmore, 202 Ill. App. 3d 994, 1011-12 (1990); see also Delta Medical, 331 Ill. App. 3d at 792.

Stenstrom contends that the information within its Excel bid spreadsheets that Mesch copied qualifies as a trade secret because it reveals Stenstrom's material costs, labor costs, profit margin, and future bids. Stenstrom further contends that it has made a reasonable effort to keep its information secret. Stenstrom notes that the bid spreadsheet information is not disclosed to

customers and, so, is sufficiently secret to give Stenstrom a competitive advantage.[1] Also, it secures its computer network with passwords and authentications. Employees with passwords are limited as to which files they can access, and the area containing physical files cannot be entered except through a secured reception area. According to Stenstrom, the information is valuable. It also notes Sockness's testimony that the information would allow competitors to determine Stenstrom's future bids. It further asserts that it paid a significant sum to purchase Old PPI and paid its estimators, including Mesch, significant amounts to create bids and/or to maintain the spreadsheet. Stenstrom also argues that there is no evidence in the record as to how a competitor could determine Stenstrom's labor and equipment rental costs, subcontractors' bids, and the actual profit margin added to all of the costs. It concludes that the bidding detail and profit margin information contained in the spreadsheet are trade secrets. Stenstrom also notes that, even if the foregoing costs could be independently determined, their compilation would still qualify as a trade secret because such a task requires the significant expenditure of time, effort, and expense. See Abbott-Interfast Corp. v. Harkabus, 250 Ill. App. 3d 13, 22 (1993), quoting Reinhardt Printing Co. v. Feld, 142 Ill. App. 3d 9, 18 (1986) ("Items such as customer lists, pricing information, and business techniques can be trade secrets if the employer has developed the information 'over a number of years at great expense and kept [it] under tight security' ").

As to the trial court's finding that Stenstrom failed to show a likelihood of prevailing on the merits, Stenstrom argues that the court erred because Stenstrom not only showed that its information was stolen--it notes that Mesch conceded as much--but also showed that Mesch actually used the stolen trade secrets to bid against Stenstrom for the same jobs.

---

[1] Stenstrom does not contend in its appeal on this count that its customer list is a trade secret.

Mesch challenges Stenstrom's assertion that the Excel spreadsheet is a trade secret. Mesch concedes that he acquired and used the spreadsheet on New PPI's behalf. However, Mesch disagrees with Stenstrom that it constitutes a trade secret.

Mesch asserts that the Excel spreadsheet does not constitute a trade secret, because it is a computer program readily available from any electronics store. He explains that he exclusively made all of the revisions to the spreadsheet after Stenstrom acquired Old PPI. According to Mesch, the spreadsheet allows the user to input item quantities that the user believes are necessary for a particular job. The spreadsheet then applies the pricing information, as previously input by the user, along with the discount information, also as previously input by the user, and a profit margin, again, input by the user, to calculate a suggested bid. Mesch argues that the same result could be achieved using only a pad of paper and a pencil. In support of his argument that the spreadsheet can be easily reproduced, he notes his testimony at the hearing that he can reproduce the spreadsheet in two or three days and that he would not need any information from Stenstrom in order to reproduce it. Rather, the information is all available from manufacturers.

Addressing certain information in the spreadsheet, such as costs of labor and materials and profit margins, Mesch contends that this data is well known. As to materials, the spreadsheet contains a manufacturer's list price in one column and Stenstrom's discount in another column. Mesch notes that he testified that he knew Stenstorm's discounts without reference to the spreadsheet and that he could recite many of them from memory. Mesch further argues that any allegedly proprietary information in the spreadsheet has little or no value to any of Stenstrom's competitors because, due to its size, Stenstrom purchases directly from manufacturers. New PPI,

in contrast, must purchase its materials through a distributor and does not receive the same level of discounts as Stenstrom.

Turning to his bid on the State Oil North Chicago job, Mesch contends that he used the spreadsheet in preparing New PPI's bid only after he had made modifications to the spreadsheet. Mesch modified the spreadsheet to reflect New PPI's discounts, and he input subcontractor prices. He points out that New PPI's bid was higher than Stenstrom's. Turning to Stenstrom's prior bids, Mesch asserts that they are not trade secrets because they are merely calculations of the costs of materials and labor, along with a profit margin. Stenstrom's materials' prices, according to Mesch, can be readily determined: they are a function of list price less a standard discount. Similarly, labor costs and subcontractor prices are readily available.

To show that certain information constitutes a trade secret, a plaintiff must show: (1) that its information is sufficiently secret to give it a competitive advantage; and (2) that it takes affirmative measures to prevent others from acquiring or using the information. 765 ILCS 1065/2(d) (West 2004). Examples of trade secrets include: customer lists, formulae, patterns, and blueprints. Central Specialties Co. v. Schaefer, 318 F. Supp. 855, 859 (N.D. Ill. 1970). Knowledge of a supplier's pricing policies, however, does not constitute a trade secret. Central Specialties, 318 F. Supp. at 859. In our view, the trial court did not err in denying Stenstrom injunctive relief on this count, because we believe that Stenstrom failed to raise a fair question as to the first Trade Secrets Act requirement and the related Restatement factors.

Stenstrom failed to raise a fair question that its spreadsheet information, including its profit margin, was sufficiently secret to give it a competitive advantage. Mesch's testimony that he could reproduce the spreadsheet in about two to three days and his assertion that he would not require

information from Stenstrom to do so was unrebutted. In order to prove that a pricing formula constitutes a trade secret, a plaintiff must establish that the value of the pricing formula lies in the fact that it is not generally known to others who could benefit by using it or that it could not be acquired through general skills and knowledge. Delta Medical, 331 Ill. App. 3d at 792. Stenstrom's spreadsheet contains information such as part numbers, quantities, list prices, discounts, markups, subcontractor bids, and labor hours. Mesch testified that all of the information necessary to recreate it "is readily available from manufacturers." In addition, he testified that he knows from memory certain of Stenstrom's discounts. He acquired this knowledge in the course of his job. We reject Stenstrom's argument that its profit margin is a trade secret. The mere knowledge of the profit desired by an employer does not constitute a trade secret. Springfield Rare Coin Galleries, Inc. v. Mileham, 250 Ill. App. 3d 922, 934 (1993).

Analysis of the relevant Restatement factors, we believe, also leads to the conclusion that Stenstrom's information does not constitute a trade secret. As to the extent to which the information is known outside and within Stenstrom's business, Mesch testified, unrebutted, that all of the information he requires to recreate the spreadsheet is available from manufacturers. As to the value of the information to Stenstrom, it was not unreasonable for the trial court to discount Sockness's self-serving testimony that the information is valuable to Stenstrom, as he failed to provide further explanation. Although Mesch testified that he made "great revisions and modifications" to the original Old PPI spreadsheet, we do not believe that the effort and time expended here, alone, necessarily requires a different result. Next, as to the ease or difficulty with which the information can be acquired or duplicated by others, we noted above Mesch's testimony that he could reproduce the spreadsheet in two to three days. Also, the information is primarily public, as it either is

published or can be acquired by a telephone call to a subcontractor, for example. In summary, other than the efforts taken by Stenstrom to guard the secrecy of the information and possibly the time expended to create and maintain the spreadsheet, we conclude that the trial court could have reasonably found that the remaining relevant Restatement factors weigh against a finding that Stenstrom's spreadsheet information constitutes a trade secret.

Our conclusion finds support in case law. See Service Centers of Chicago, Inc. v. Minogue, 180 Ill. App. 3d 447, 455 (1989) (reversing preliminary injunction, finding that employer's pricing formula, which consisted of a customer survey, certain rules of thumb, and the use of a linear foot measurement, did not constitute a trade secret); Central Building & Cleaning Co. v. Vodnansky, 84 Ill. App. 3d 586, 590 (1980) (denial of preliminary injunctive relief not an abuse of trial court's discretion where employer's estimating method involved estimating the time to complete a job, labor and materials costs, and variables such as architectural detail, brick types, and possible hindrances such as power lines). Moreover, other jurisdictions have similarly concluded that various methods of calculating bids or the constituent elements of bids are not trade secrets. See Fortna v. Martin, 158 Cal. App. 2d 634, 640, 323 P.2d 146, 149 (1958) (although employer utilized a pricing/bidding system that considered its costs, "any successful business man must do the same"); Porter Industries, Inc. v. Higgins, 680 P.2d 1339, 1342 (Colo. App. 1984) (employer's pricing and bidding structure not a trade secret); Mo-Kan Central Recovery Co. v. Hedenkamp, 671 S.W.2d 396, 400 (Mo. App. 1984) (mere existence of an undefined bidding structure did not establish a trade secret where there was no evidence presented that the structure was novel or complicated and could not be easily duplicated by others and where no security measures were taken to maintain necessary element of secrecy); Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 36-37, 274 A.2d 577, 583 (1971); cf. Ovation

Plumbing, Inc. v. Furton, 33 P.3d 1221, 1224 (Colo. App. 2001) (declining to adopt per se rule that a bid itself, as opposed to the procedure for calculating it or its constituent elements, cannot be a trade secret as a matter of law where the defendant actually took information on specific bids for purpose of bidding against the plaintiff).

b.  Inadequate Legal Remedy and Irreparable Harm

Although we need not address the remaining requirements to obtain a preliminary injunction, we choose to do so because the issues are easily resolved.  Thus, we provide the following alternative bases for rejecting Stenstrom's arguments concerning injunctive relief as to its Trade Secrets Act claim against Mesch.

Addressing the trial court's finding that it failed to raise a fair question that there was no adequate remedy at law, Stenstrom argues that it showed that Mesch and New PPI have successfully used Stenstrom's stolen trade secrets to obtain work first bid on by Stenstrom and will continue to do so to compete unfairly against Stenstrom.  According to Stenstrom, Mesch has not offered any explanation as to why the court should believe that he did not retain copies of the stolen Stenstrom information.  Stenstrom contends that it is deserving of protection against the virtual certainty that Mesch has retained and will continue to use copies of the information that he stole.  Alternatively, Stenstrom argues that, even if Mesch returned all of the stolen information, his actions prior to returning it damaged Stenstrom's reputation because, by using the information, Mesch eroded customers' loyalty to Stenstrom.  Stenstrom notes that State Oil did leave Stenstrom for New PPI by virtue of accepting New PPI's higher bid for the North Chicago job.  Stenstrom reasons that loss of competitive position is incapable of being measured and, therefore, there is an inadequate remedy at law.  See A-Tech Computer Services, Inc. v. Soo Hoo, 254 Ill. App. 3d 392, 401 (1993).

Mesch responds that his possession of Stenstrom's alleged trade secrets was not continuing, because he returned all such information to Stenstrom in accordance with the TRO on March 13, 2007, which was less than three months after his termination date. Mesch further asserts that a remedy at law could be measured. He submitted a limited number of bids for New PPI and only one of those bids was accepted. Addressing the two bids Stenstrom offered as evidence, Mesch notes that New PPI overbid Stenstrom. Further, Mesch asserts that the allegedly proprietary information he possessed was not disclosed to any third party other than New PPI. He also notes that the only information potential customers receive are the bids themselves. Stenstrom's underlying price information is not disclosed. Thus, there is no mass dissemination of Stenstrom's information. Addressing the irreparable harm requirement, Mesch responds that there is no danger here of recurrent violations because neither he nor New PPI currently has access to Stenstrom's allegedly confidential information.

"[P]rolonged interruptions in the continuity of business relationships can cause irremedial damages for which no compensation would be adequate." Wolf & Co. v. Waldron, 51 Ill. App. 3d 239, 243 (1977). Under the Act, "[a]ctual or threatened misappropriation may be enjoined." 765 ILCS 1065/3 (West 2004). Using a theory of inevitable disclosure, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Pepsico, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995). The fact that a former employee accepted a similar position with a competitor, without more, will not demonstrate inevitable disclosure. See Liebert, 357 Ill. App. 3d at 284. Courts also consider the level of competition between the parties and the new employer's actions to prevent unlawful disclosure of trade secrets. Liebert, 357 Ill. App. 3d at 284. That a complaint also seeks

monetary damages does not foreclose injunctive relief. <u>Continental Cablevision of Cook County, Inc. v. Miller</u>, 238 Ill. App. 3d 774, 788 (1992). To show irreparable injury, the plaintiff is not required to show that the injury is beyond repair or compensation in damages, but need show only transgressions of a continuing nature. <u>Continental Cablevision</u>, 238 Ill. App. 3d at 788.

We reject Stenstrom's argument that it sufficiently showed that Mesch will continue to compete unfairly against Stenstrom because he will continue to use its allegedly confidential information. It was not unreasonable for the trial court to find that Stenstrom failed to raise a fair question as to an inadequate legal remedy or irreparable harm where Mesch returned all of the computer files that he copied from Stenstrom's computers, especially in the absence of evidence that he still retained any copies of those files. As to Stenstrom's assertion that it has lost its competitive position in the industry, we cannot conclude that the trial court erred in discounting this argument, in light of the fact that Stenstrom lost out on only one job against New PPI after Mesch began working for the new company. Furthermore, it is undisputed that State Oil collects several proposals for its projects. This weighs against a finding that Stenstrom has permanently lost State Oil as a customer. Finally, as Mesch notes, there could be no mass dissemination of Stenstrom's allegedly confidential information because the bids submitted to potential customers do not include all of the component information.

In summary, we conclude that the trial court did not abuse its discretion in declining to enter a preliminary injunction against Mesch on the basis of his alleged violations of the Trade Secrets Act.

### 3. Trade Secrets Act Claim Against New PPI

Stenstrom next argues that the trial court erred in denying it injunctive relief against New PPI based upon New PPI's violations of the Trade Secrets Act. Stenstrom asserts that it has a protectable interest in its customer list and argues that Mesch will inevitably disclose Stenstrom's trade secrets to New PPI. It notes that the information has already been copied to New PPI's computers and used for New PPI by an employee--Mesch--who will receive 20% of New PPI's profits and who named the company.

In its claim against New PPI, Stenstrom asserts that both the spreadsheet information and its customer list constitute trade secrets. Because we rejected above its argument that it established its right to injunctive relief based on the spreadsheet information, we need not address that issue again here in relation to New PPI. Thus, we proceed by examining only whether Stenstrom established a right to injunctive relief based on its argument that its customer list constitutes a trade secret. For the reasons we state below, we reject Stenstrom's argument. Accordingly, we do not reach its inevitable disclosure argument, which is premised on the existence of a trade secret. See Pepsico, 54 F.3d at 1267-68 (party seeking an injunction under the Act must prove both the existence of a trade secret and an actual or threatened misappropriation, and inevitable disclosure theory addresses threatened misappropriation, which, in turn, bears on the reasonable-likelihood-of-success requirement for a preliminary injunction).

Turning to the first requirement for a preliminary injunction--a protectable interest (i.e., a trade secret)--the Act defines a trade secret to include a "list of actual or potential customers or suppliers." 765 ILCS 1065/2(d) (West 2004). Again, the statute requires that a plaintiff show: (1) that the information is sufficiently secret to give it a competitive advantage; and (2) that it takes affirmative measures to prevent others from acquiring or using the information. 765 ILCS 1065/2(d)

(West 2004). In addition to the Act's requirements, courts consider the six Restatement factors we listed above. See, e.g., Liebert, 357 Ill. App. 3d at 276-77. "In determining whether [a customer list] is a trade secret, the focus of both the common law and the [Trade Secrets Act] is on the secrecy of the information sought to be protected." Stampede Tool Warehouse, Inc. v. May, 272 Ill. App. 3d 580, 588 (1995).

Here, the parties confuse the foregoing tests with the near-permanent-relationship test that applies in cases involving restrictive covenants. See, e.g., LSBZ, 237 Ill. App. 3d at 426. The near-permanent-relationship test focuses on the strength of an employer's relationship to its clients and not on the secrecy of its customer list. We caution the parties that the near-permanent-relationship test does not apply to a claim brought under the Trade Secrets Act. See Stampede Tool Warehouse, 272 Ill. App. 3d at 586. Because Stenstrom does not address the correct legal standard, we do not address its argument concerning its Trade Secrets Act claim against New PPI. See Groenings v. City of St. Charles, 215 Ill. App. 3d 295, 306 (1991) (reviewing court may deem waived those issues that have not been sufficiently or properly presented, including with relevant authority cited); 210 Ill. 2d R. 341(h)(7).

### 4. Breach of Fiduciary Duty Claims Against Mesch and New PPI

Next, Stenstrom argues that the trial court erred in denying it preliminary injunctive relief against Mesch and New PPI based on Mesch's breach of his fiduciary duty to Stenstrom. Stenstrom notes that it seeks this relief against Mesch to prevent him from soliciting its customers. According to Stenstrom, Mesch was working for New PPI's benefit when he took and failed to return Stenstrom's trade secrets. As to its breach of fiduciary duty claim against New PPI, Stenstrom argues that New PPI is liable for Mesch's actions because Mesch acted as its agent when he copied

Stenstrom's secret information for the benefit of New PPI, for the purpose of using the information at New PPI. It further contends that, as a New PPI employee, Mesch actually used the information for his new employer. According to Stenstrom, Mesch will receive 20% of New PPI's profits in addition to his salary, and Stenstrom notes that he named New PPI.

We do not address these arguments at length because, although Stenstrom acknowledges that its breach of fiduciary duty claims are independent of its Trade Secrets Act claims, it repeatedly asserts in this portion of its brief that Mesch stole its trade secrets, thus premising its fiduciary duty claims on the adequacy of its showing that its information constitutes a trade secret, an argument we rejected above. It is well settled that "[a] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented ([210 Ill. 2d R. 341(h)(7)]), and it is not a repository into which an appellant may foist the burden of argument and research." Obert v. Saville, 253 Ill. App. 3d 677, 682 (1993). We deem Stenstrom's breach of fiduciary duty arguments waived.

Waiver aside, we note that Stenstrom again argues that it adequately asserted a lack of an adequate remedy at law. According to Stenstrom, Mesch and New PPI will continue to use its trade secrets to compete unfairly against it. We again reject this argument for the reasons we stated above in relation to Stenstrom's Trade Secrets Act claim against Mesch.

### B. Motion Taken with the Case and Mesch's Cross-Appeal

In his cross-appeal, Mesch argues that the trial court erred in entering the preliminary injunction. He argues that the covenant not to compete is not valid and enforceable because it lacks consideration. Alternatively, Mesch asserts that, even if the covenant was supported by adequate

consideration, Stenstrom does not have a protectable interest, such as near-permanent customer relationships or confidential information, sufficient to enforce the agreement.

In a motion we ordered taken with the case, Stenstrom moves to dismiss Mesch's cross-appeal as moot. It argues that the preliminary injunction expired on June 26, 2007, and, therefore, the cross-appeal is now moot because it involves no actual controversy. It contends that, only if we accept its first argument concerning the commencement of the injunction would we need to reach the arguments Mesch raises in his cross-appeal.

Mesch responds that Mohanty v. St. John Heart Clinic, S.C., 225 Ill. 2d 52 (2006), instructs that his cross-appeal is not moot. In that case, two physicians sued their employer and its owner seeking a declaratory judgment that the restrictive covenants in their employment contracts were void as against public policy and unenforceable. The employer and its owner counterclaimed for declaratory, injunctive, and other relief to restrain the physicians from violating the restrictive covenants. The defendants also raised misappropriation and unjust enrichment claims and sought a declaration concerning the employer's responsibility for providing certain malpractice coverage. The trial court denied the defendants' request for a preliminary injunction, but the appellate court reversed. The supreme court held that the appeal was not moot as to a physician whose restrictive covenant period had lapsed. Mohanty, 225 Ill. 2d at 92. It noted that the defendants' countercomplaint sought damages for harm allegedly incurred and revenues allegedly lost as a result of the physicians' violations of the restrictive covenants. Mohanty, 225 Ill. 2d at 92. It reasoned that a decision concerning the enforceability of the restrictive covenants "could have a direct impact on [the one physician's] rights and obligations in these matters." Mohanty, 225 Ill. 2d at 64.

We believe that Mesch's reliance on <u>Mohanty</u> is misplaced because, in that case, the counterclaims were based on violations of the restrictive covenants. Here, we reject Mesch's contention that a decision on the enforceability of the restrictive covenant will have a direct impact on Mesch's rights and obligations as to the other claims in Stenstrom's complaint. Stenstrom's Trade Secrets Act and breach of fiduciary duty claims are independent of the restrictive covenant claim.

Given our resolution of Stenstrom's argument concerning the preliminary injunction's commencement date, the preliminary injunction expired on June 26, 2007. "An issue is moot when its resolution could not have any practical effect on the existing controversy." <u>La Salle National Bank, N.A. v. City of Lake Forest</u>, 297 Ill. App. 3d 36, 43 (1998). Moreover, a court cannot dissolve an injunction that has expired. <u>Multiut Corp. v. Draiman</u>, 359 Ill. App. 3d 527, 543 (2005) (appeal dismissed); see also <u>The Agency, Inc. v. Grove</u>, 362 Ill. App. 3d 206, 209 (2005) (enforceability of noncompetition provision was a moot issue where noncompetition period had expired). We agree with Stenstrom that the restrictive covenant's enforceability is mooted by the expiration of the preliminary injunction. Accordingly, we dismiss Mesch's cross-appeal and do not address the enforceability of the restrictive covenant.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

GROMETER, P.J., and HUTCHINSON, J., concur.